## UNITED STATES *v.* NESS.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 284.   Argued November 5, 1917.—Decided December 10, 1917.

The filing of a certificate of arrival, as provided in § 4, subdivision 2, of the Naturalization Act, is an essential prerequisite to a valid order of naturalization.

The court of naturalization having assumed to dispense with this requirement upon proof of reasons why the certificate of arrival could not be obtained, *held,* that the certificate of naturalization was subject to be set aside, in a suit by the United States under § 15 of the act, as a certificate "illegally procured."

Sections 11 and 15 of the Naturalization Act afford cumulative protection against fraudulent or illegal naturalization.   In a suit under the latter to set aside a certificate granted in disregard of an essential requirement of the statute, the United States is not estopped by the order of naturalization, although, pursuant to the former section, it entered its appearance in the naturalization proceedings and there unsuccessfully raised the same objection.

230 Fed. Rep. 950, reversed.

THE case is stated in the opinion.

*The Solicitor General* for the United States.

*Mr. Denis M. Kelleher,* with whom *Mr. B. J. Price* was on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

This suit was brought under § 15 [1] of the Naturalization Act (June 29, 1906, 34 Stat. 596), in the District Court of the United States for the Northern District of Iowa, to cancel a certificate of naturalization issued to Ness by a state court of Iowa on May 21, 1912. The naturalization is alleged to have been "illegally procured," because the petitioner failed to file with the clerk the certificate from the Department of Commerce and Labor "stating the date, place and manner" of arrival as provided in § 4, subdivision second.[2] Ness admitted this failure; but contended that on the facts hereinafter stated he was nevertheless entitled to naturalization, and that, in any event, his right thereto had become *res judicata* for the following reason: The United States entered its appearance under § 11 [3] (by the chief naturalization examiner of

---

[1] "Sec. 15. That it shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit, for the purpose of setting aside and canceling the certificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured. . . ."

[2] "Sec. 4. Second: . . . At the time of filing his petition there shall be filed with the clerk of the court a certificate from the Department of [Commerce and] Labor, if the petitioner arrives in the United States after the passage of this Act, stating the date, place, and manner of his arrival in the United States, and the declaration of intention of such petitioner, which certificate and declaration shall be attached to and made a part of said petition."

[3] "Sec. 11. That the United States shall have the right to appear before any court or courts exercising jurisdiction in naturalization proceedings for the purpose of cross-examining the petitioner and the witnesses produced in support of his petition concerning any matter touching or in any way affecting his right to admission to citizenship, and

the Department of Commerce and Labor) "in opposition to the granting" of naturalization and submitted a motion that the petition be dismissed on the ground that the certificate of arrival was not attached. The motion was duly considered by the court and denied. Then, after hearing the petitioner and his witnesses, the order of naturalization was granted. This bill was filed within six months thereafter.

The facts relied upon by Ness as entitling him to naturalization, although he had not filed the certificate of arrival, were as follows:

He emigrated from Norway and arrived at the port of Buffalo by rail via Canada in August, 1906. Ignorant of the requirements of the immigration and naturalization laws of the United States and unobserved by officials of the Government and of the railroad, he entered this country without submitting himself to physical examination, without paying the alien head tax, and without having his entry registered. After filing his petition for naturalization he learned that it was defective for failure to file the certificate of arrival and immediately applied to the Bureau of Immigration and Naturalization for such certificate, but found it could not be furnished, because no registry of his entry had been made. After receiving his certificate of naturalization, he offered to pay the head tax and to submit himself to medical examination; but his offer was refused. He possessed the personal qualifications which entitle aliens to admission and to citizenship.

The District Court dismissed the bill (217 Fed. Rep. 169). Its decree was affirmed by the Circuit Court of Appeals (230 Fed. Rep. 950); and this court granted a writ of certiorari. The case presents questions of importance in the administration of the Naturalization Act.

---

shall have the right to call witnesses, produce evidence, and be heard in opposition to the granting of any petition in naturalization proceedings."

*First:* Whether filing the certificate of arrival as provided in § 4, subdivision second, is an essential prerequisite to a valid order of naturalization.

It is urged that the certificate of arrival is merely a form of proof which the naturalization court has power to dispense with for cause. The uses served by the certificate, the history of the provision and its relation to other parts of the act show that this contention is unsound.

Section 1 requires that a registry be made of certain facts concerning each alien arriving in the United States; and that "a certificate of such registry with the particulars thereof" be granted to each alien.[1] Section 5 re-

---

[1] The requirement of such registry was first introduced by the Act of June 29, 1906; but its importance in connection with naturalization had long been recognized and had been pressed upon Congress. The Commissioner General of Immigration recommended, in his report for 1898, p. 36: "Each arriving immigrant, when admitted to the United States, should be provided with a landing certificate setting forth the name, age, sex, birth place of the immigrant, government to which allegiance is due, the port from which the vessel sailed, the name of the vessel, the line it belongs to, the port it arrives at, and the date of landing. The immigrant should be instructed, by means of a circular, to retain the certificate for presentation when applying for naturalization papers. A record of the facts stated in the said circular [certificate] as to each immigrant, to be known as an Immigrant Directory should be kept for each fiscal year by the Bureau of Immigration. An act of Congress authorizing such a course of procedure and requiring of the alien presenting himself for naturalization to produce such a certificate or a duplicate from the Immigrant Directory would facilitate the work of the courts and go far toward preventing the issuance of fraudulent naturalization papers in future." Without express authority from Congress the Bureau of Immigration undertook, in 1900, to make such a registry and issue certificates of arrival (Mr. Bonynge, 40 Cong. Rec., p. 3644) and in 1902–3 a card system was introduced "by means of which such an accurate and accessible record is kept at every port of arrival that at any subsequent time the name, date of arrival, and other particulars in regard to every alien entering the United States can be readily ascertained." (Report of Commissioner General, 1903, p. 120.) For this reason, while other provisions of the Act of June 29,

quires clerks of court to give public notice of each petition for naturalization filed. Section 6 prohibits courts from taking final action upon any petition until 90 days after such notice has been given. That period is provided so that the examiners of the Bureau of Naturalization and others may have opportunity for adequately investigating whether reasons exist for denial of the petition. The certificate of arrival is the natural starting point for this investigation. It aids in ascertaining (*a*) whether the petitioner was within any of the classes of aliens who are excluded from admission by §§ 2 and 38 of the Immigration Act of February 20, 1907, 34 Stat. 898; (*b*) whether he is among those who are excluded from naturalization under § 7 of the Naturalization Act—for political beliefs or practices; (*c*) whether he is the same person whose declaration of intention to become a citizen is also attached to the petition under § 4, subdivision second; (*d*) whether the minimum period of five years' continuous residence prescribed by § 4, subdivision fourth, has been complied with. The certificate of arrival is in practice deemed so important that in the regulations issued by the Secretary of Labor under § 28 "for properly carrying into execution the various provisions" of the act, the clerk of court is advised that he "should not commence the execution of the petition until he has received the certificate of arrival." [1]

---

1906, did not take effect until 90 days after its passage, (see § 31), it was possible to make § 1 effective immediately; and under § 4, subdivision second, the certificate of arrival is required "if the petitioner arrives in the United States after the passage of this Act."

[1] Beginning with regulations issued May 22, 1911, and including those issued February 15, 1917. (See § 5 of the Regulations.) For a description of the practice pursued see Report of the Commissioner of Naturalization for 1914, pp. 22–23. Until Act of March 4, 1913, creating the Department of Labor, the Bureau of Naturalization was in the Department of Commerce and Labor.

Filing the certificate of arrival being a matter of sub-
stance, it is clear that no power is vested in the naturaliza-
tion court to dispense with it. Section 4 declares: "That
an alien may be admitted to become a citizen of the United
States in the following manner and not otherwise." Sec-
tion 27 declares: "That substantially the following forms
shall be used in the proceedings to which they relate";
and the form of petition therein prescribed recites:
"Attached hereto and made a part of this petition" is
"the certificate from the Department of [Commerce and]
Labor required by law." Experience and investigation
had taught that the wide-spread frauds in naturalization,
which led to the passage of the Act of June 29, 1906, were,
in large measure, due to the great diversities in local
practice, the carelessness of those charged with duties
in this connection, and the prevalence of perjured testi-
mony in cases of this character. A "uniform rule of nat-
uralization" embodied in a simple and comprehensive
code under federal supervision, was believed to be the only
effective remedy for then existing abuses. And, in view of
the large number of courts to which naturalization of
aliens was entrusted and the multitude of applicants,[1]
uniformity and strict enforcement of the law could not be
attained unless the code prescribed also the exact char-
acter of proof to be adduced. The value of contemporary
documentary evidence was recognized; and the certificate
of arrival was, therefore, specifically included among the
prerequisites to naturalization.[2] Naturalization granted

---

[1] The average number of aliens naturalized for several years preceding
1906 was estimated at 100,000. Report of Special Commission on
Immigration appointed by the President March 1, 1905 (59th Cong.
1st sess., Doc. 46, p. 26). In the year ending June 30, 1916, 93,911
certificates of naturalization were granted and 11,927 petitions were
denied. Of these, 399 were denied for failure to file certificate of arrival.
Report of Commissioner of Naturalization, pp. 4, 6.

[2] The Act of June 29, 1906, embodies in the main the legislation rec-
ommended in the Report of the Special Commission. The requirement

without the certificate having been filed, is, therefore, "illegally procured" [1]; *United States* v. *Ginsberg*, 243 U. S. 472; and it may, at least where the proceedings were *ex parte*, be set aside under § 15.

*Second:* Whether an order entered in a proceeding to which the United States became a party under § 11 is *res judicata* as to matters actually litigated therein, so that the certificate of naturalization cannot be set aside under §15, as having been "illegally procured."

This question discussed, and left undecided, in *Johannessen* v. *United States*, 225 U. S. 227, 238, is, in effect: Do § 11 and § 15 afford the United States alternative or cumulative means of protection against illegal or fraudulent naturalization under the Act of June 29, 1906?

The remedy afforded by § 15 for setting aside certificates of naturalization is broader than that afforded in equity, independently of statute, to set aside judgments, *United States* v. *Throckmorton*, 98 U. S. 61; *Kibbe* v. *Benson*, 17 Wall. 624; but it is narrower in scope than the protection offered under § 11. Opposition to the granting of a petition for naturalization may prevail, because of objections to the competency or weight of evidence or the credibility

---

therein proposed (p. 98) concerning the certificate of arrival was adopted in terms except that the Commission had proposed it should apply to all aliens arriving after January 1, 1900. The Report of Special Examiner Van Deusen, thereto annexed, states (p. 80): "The code should also specifically set forth the exact proof to be adduced by the alien and his witnesses as a precedent to the admission of the alien. Such proof should include documentary or other evidence of the date and place of birth and a certificate of immigration showing the date of arrival and the port or place of entry of the alien into the United States." See Mr. Hayes, 40 Cong. Rec., pp. 7043–4. Report of Commissioner General of Immigration for 1909, p. 209.

[1] In *In re Liberman*, 193 Fed. Rep. 301, and *In re Hollo*, 206 Fed. Rep. 852, where naturalization was refused on this ground, the petitions were dismissed without prejudice. Compare Report of Commissioner General of Immigration for 1908, p. 191.

of witnesses, or mere irregularities in procedure. A decision on such minor questions, at least of a state court of naturalization, is, though clearly erroneous, conclusive even as against the United States if it entered an appearance under § 11. For Congress did not see fit to provide for a direct review by writ of error or appeal.[1] But where fraud or illegality is charged, the act affords, under § 15, a remedy by an independent suit "in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit." If this suit is brought in the federal District Court, its decision will also be subject, under the general law, to review by the Circuit Court of Appeals, and, on certiorari, by this court. Such an independent suit necessarily involves considerable delay and expense; and it may subject the individual to great hardship. On the other hand, a contest in the court of naturalization is usually disposed of expeditiously and with little expense. The interest of all concerned is advanced by encouraging the presentation of known objections to naturalization at the earliest possible stage of the proceedings; so that the petitioner may, if the defects are remediable, remove them, and if not, may adopt, without delay, such course, if any, as will ultimately entitle him to citizenship. It would have defeated this purpose to compel the United States to refrain from presenting any objection, or the objection of illegality, in the court of naturalization, unless it is willing to accept the decision of that court as final.

---

[1] The bill submitted by the Commission on Naturalization provided for such appellate proceedings and its proposal was recommended to the House by the Committee on Immigration and Naturalization as § 13 (Report of February 6, 1906, p. 5); but after debate in the Committee of the Whole (40 Cong. Rec., pp. 7784–7787) was stricken from the bill. The bill proposed by the Commission and recommended by the House Committee contained in addition (as § 17) the provision for cancellation proceedings enacted as § 15.

It was the purpose of Congress, by providing for appearances under § 11, to aid the court of naturalization in arriving at a correct decision and so to minimize the necessity for independent suits under § 15. In most cases this assistance could be given best by an experienced examiner of the Bureau of Naturalization familiar with the sources of information. Section 11, unlike § 15, does not specifically provide that action thereunder shall be taken by the United States district attorneys; and if appearance under § 11 on behalf of the Government should be held to create an estoppel, no good reason appears why it should not arise equally whether the appearance is by the duly authorized examiner or by the United States attorney.[1] But in our opinion § 11 and § 15 were designed to afford cumulative protection against fraudulent or illegal naturalization. The decision of the Circuit Court of Appeals is therefore

*Reversed.*

---

[1] In *United States* v. *Mulvey*, 232 Fed. Rep. 513, where an order for naturalization was cancelled under § 15, on grounds which the Examiner of the Bureau of Naturalization had presented in opposition to the granting of naturalization, stress was laid upon the fact that the representative of the Bureau was not a law officer of the Government and that he appeared as *amicus curiæ;* but in view of the language of § 11, the distinction does not seem of importance. See also Report of Commissioner of Naturalization for 1915, pp. 20–21.