### UNITED STATES v. OLSEN.

(District Court, W. D. Washington, S. D.    April 26, 1921.)

No. 200–E.

1. **Aliens ☞71½, New, vol. 7 Key-No. Series—Naturalization certificate on qualified testimony as to fitness is "illegally procured."**

Under Naturalization Act, § 4 (Comp. St. § 4352), requiring the witnesses for the applicant to state that he is a person of good moral character and requiring the court to be satisfied he is in every way qualified to be a citizen, and section 7 (section 4363), denying naturalization to members of an organization opposed to government, a certificate of naturalization based on the testimony of witnesses who qualified their opinion as to the fitness of petitioner because of his connection during the war with a strike instigated by the I. W. W., is "illegally procured," though the witnesses testified to his good character except for that fact, and the state court found that petitioner was not at fault in that regard, since the statute clearly requires unqualified testimony to good character.

2. **Aliens ☞71½, New, vol. 7 Key-No. Series—Change of witnesses' opinion after certificate may be based on hearsay.**

The fact that the change of opinion concerning the character of petitioner for naturalization in the minds of his witnesses occurred after they had made their affidavits to his good character and was founded in part upon hearsay is immaterial, since reputation can only be established by hearsay, and such change of opinion prevents the naturalization of petitioner.

3. **Aliens ☞71½, New, vol. 7 Key-No. Series—Naturalization is "illegally procured" where part of inquiry is not in open court.**

A naturalization certificate is illegally procured where it appears that part of the inquiry by the judge upon which it was issued was made by him, and not in open court.

4. **Aliens ☞71½, New, vol. 7 Key-No. Series—Naturalization certificate may be canceled on qualification by witnesses of opinion of fitness.**

Under Naturalization Act, § 15 (Comp. St. § 4374), authorizing a suit to cancel a naturalization certificate, illegally procured, the certificate should be canceled where it appeared that it was issued by the state court upon the testimony of witnesses who qualified their opinion as to the fitness of petitioner for citizenship, though the government was represented at the naturalization hearing and contested the naturalization on that ground, and the court found that the qualification was not based on fact.

In Equity.    Suit by the United States against Ole Christopher Olsen to cancel his certificate of naturalization.    Decree for complainant.

Robert C. Saunders, U. S. Atty., of Seattle, Wash., and John M. Boyle, Jr., Asst. U. S. Atty., of Tacoma, Wash.

O. M. Nelson, of Montesano, Wash., for defendant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CUSHMAN, District Judge. The present suit is one to cancel defendant's naturalization certificate. The bill of complaint avers:

"That the said certificate of naturalization was illegally procured in this: That at the hearing of the petition for naturalization of him, the said Ole Christopher Olsen, before the said superior court, no witnesses testified to the effect that he, the said Ole Christopher Olsen, then was of good moral character, or that he, the said Ole Christopher Olsen, then was attached to the principles of the Constitution of the United States, or that he, the said Ole Christopher Olsen, then was worthy of becoming a citizen of the United States, but, on the contrary, the only witnesses other than him, the said Ole Christopher Olsen, who testified upon the said hearing, namely, Fred W. Hardy and Howard L. Dyer, testified respectively that the said Ole Christopher Olsen then was not worthy of becoming a citizen of the United States, and that they could not recommend him for admission to citizenship."

One of the affidavits upon which the bill was·filed is as follows:

"Fred W. Hardy, being first duly sworn, on oath deposes and says: That on the 9th day of April, 1917, and ever since has been and still is foreman of the box factory in the plant of the National Lumber & Manufacturing Company of Hoquiam, Wash.; that on or about said date he appeared as a witness to the petition of the Ole Christopher Olsen in the clerk's office at the courthouse in the city of Montesano, Wash., at the request of said petitioner, Olsen, for citizenship; that at that time he believed that said Olsen was qualified to become a citizen of the United States; that thereafter, to wit, on or·about the 1st day of December, 1917, he appeared in court at Montesano, Wash., along with the petitioner and his other witness, Howard L. Dyer; that before going to Montesano on said last-named date both he and witness Dyer informed Olsen that they could do him no good and he had better not take them up, as they did not care to recommend him, but Olsen insisted on their attending the hearing; that in the courtroom, on the witness stand, both affiant and witness Dyer stated that they did not think the petitioner, Olsen, worthy of becoming a citizen, and could not recommend him; that one of the reasons for affiant changing his opinion between the time he signed the petition and the date of the hearing was the fact that the petitioner had deserted government work and walked out with the I. W. W. strikers; that thereafter in the course of two weeks the petitioner came to this affiant and requested him to sign a letter to the court in which it was stated in substance that this affiant withdrew his objections to the petitioner becoming a citizen. This affiant states he refused to do."

Upon the trial the judge of the court who naturalized the defendant testified:

"A. At the first hearing the petitioner was examined, together with his two witnesses. The witnesses were Mr. Hardy and Mr. Dyer, both connected with the National Lumber & Box Company of Hoquiam. The petitioner was a resident of Hoquiam, in our county, and had been an employee of the National Lumber & Box Company for some time previous. They were his two witnesses. It developed on examination of his two witnesses that there had been some recent trouble relative to a strike which had occurred at the mill. They testified, each of the witnesses testified, that he was a man of good character. They gave him a clean bill of health in that concern, but confessed that they didn't think they were justified in recommending him to the court for citizenship because òf the fact of the occurrence of this strike. The petitioner then at the time asserted that he was not connected with the strike and was not affiliated with the I. W. W. or any kindred organization. The witnesses had intimated that he was. I took the matter in hand and examined them myself. They then said that his men went out on strike, and not he himself; that from his statement, and they corroborated it, also from the statement of the witnesses, it seemed that he had a contract with these people, a contract with the National Lumber & Box Company to get out; it was either loading cars or something of that kind. The entire force of the

mill went out on a strike, and, among others, his men. They were not working for the mill, but for him. He had an independent contract; but they went out, and that caused the abandonment of the contract. By reason of the fact that his men went out, he was compelled to leave the contract and the mill premises. There was considerable discussion between myself, as the court, the examiner and the two witnesses and the petitioner relative to that. I tried to reason with them and said that they were not justified in the position they took without showing him responsible for the men going on strike. Mr. Hardy persisted. The outstanding fact was that they recommended him with this qualification: That they didn't think he had done right in going out on strike. I don't know whether they thought he was responsible for the strike, so far as his men were concerned, or whether they thought that he could have prevented it. I don't know. I rather thought that was the attitude they took.

"By the Court: They thought it was a subterfuge? A. Yes.

"By the Court: They suspected it? A. Yes. All of the matter in connection with the hearing; they were very positive. They had known him a long time. He was a man of family, a home owner in Hoquiam; been living there a number of years, and had never been connected in any way with any radical organization. The examiner was very vigorous in his protest against the admission. Therefore I continued it until the next hearing. I stated that the examination had satisfied me in my own mind, but I let the matter go over. Subsequently we had the second examination. By the way, I think just at the time that I examined him they were not all present at the next hearing. We generally have 20 or 30 applicants. It takes all morning to hear them. We convene at 9 o'clock. Sometimes it runs into the afternoon. This particular case—when those on the regular list had been examined, the examiner left. The petitioner appeared after the departure of the examiner, about noon. Whether I took it up at 1 o'clock or not, I don't know. It was after the examiner had gone. In the meantime, between the two hearings, I had talked with various officers. I had formerly lived in Hoquiam before being appointed to the bench. I talked to a good many who knew the man, and they recommended him very earnestly. They thought that Mr. Hardy, the superintendent, was mistaken in his attitude. Mr. Dyer, the other witness, at that time had joined the Twentieth Engineers and gone to France. Whether he called me up on the telephone or wrote me a letter, I don't remember. I am informed now that he did write me a letter. At any rate, in talking to Mr. Dyer—the two witnesses were not there at the time of the second hearing—he told me that he would withdraw any objections; that upon reconsideration he had found he was mistaken in the attitude he had taken, but subsequent to my investigation. I ordered the admission at that time. Subsequent to that time this proceeding was instituted by the government to cancel the certificate of naturalization. Is there anything else?

"Q. You say so far as these two witnesses—they gave him a good record to every question asked? A. Absolutely. I exercised my judgment in the matter. I felt that I was doing the right thing. I thought their objection was entirely unfounded. * * *

"Q. (on cross-examination). There never was any witness testified, outside of Mr. Hardy and Mr. Dyer, on behalf of the applicant? A. No.

"Q. Did Mr. Hardy and Mr. Dyer, both witnesses, testify at that hearing that the applicant was an I. W. W.? A. They did not.

"Q. Did they testify that he was attached to the principles of the Constitution, and, in their opinion, would make a good citizen? A. They did.

"Q. That he was attached to the principles of the Constitution, and, in their opinion, would make a good citizen? A. With the qualification: There was a reservation that—they had always thought and still thought that he was a man of good character and would make a good citizen, with the exception of this matter, which the petitioner claimed was unfounded.

"Q. What was the effect of their testimony? Did they testify that he would be a good citizen or did they not? A. The only conclusion was that they were of the opinion that he would make a good citizen and was a man of good moral character, qualified with this reservation.

"Q. Was not the effect that he would not, and, if not, for that consideration?

A. I did not so consider it. They had formerly, when they first appeared as witnesses, testified to his good character. My recollection is—the statements which were sent out by the government to the various witnesses asking the record of the petitioner are in the possession of the examiner. This matter came up a short time before the hearing. They were mad because he was not in their employ and the contract had to be abandoned.

"Q. Did not they state or testify that they wished to withdraw the affidavits filed? A. I think they did.

"Q. That they did not wish to testify in his behalf? A. I believe it was stated that Mr. Hardy didn't want to be a witness. That morning Mr. Hardy had told Olsen that he did not want to be a witness coming up from Hoquiam.

"Q. Did they not say at the hearing that the reason was they didn't believe he would be a good citizen? A. There might have been an answer to that effect, that is, based on that qualification, that they—of course, the examination took a wide latitude and extended range. They were questioned both by the court and examiner, and it may have been answered from both lines.

"Q. But you state that they did testify that the applicant would be a good citizen and was attached to the principles of the Constitution of the United States? A. Yes; possibly. I don't know whether those questions were asked point blank, or whether they evaded a direct answer; but the general tenor and extent of the examination was that he would be; that they had known him for a long time and were satisfied with him, with this possible one exception, and I stated that the examination—that I would take it under advisement and make some investigation on my own initiative, which I frequently do.

"Q. Then they did make one exception which was a hindrance to his becoming a good citizen? A. Yes.

"Q. Then there never was any other evidence introduced before you that contradicted that? A. I don't think Mr. Smith was sworn. Of course, his name was not posted as a witness. He could not be a witness.

"Q. What was your idea in continuing the hearing? A. To investigate the matter myself. Because of what developed from the hearing, some contention arose. I was satisfied myself.

"Q. Then you made a personal investigation yourself by conversing with people whom you know and who knew the applicant? A. Yes; officers.

"Q. And their testimony or statements were made not under oath? A. They were not.

"Q. Then did you determine to admit the applicant from your personal investigation or from evidence you heard at the hearing? A. No; I was satisfied from hearing the testimony of the two witnesses.

"Q. What was your reason, then, being satisfied from their testimony, in making an investigation? A. Because of the dispute between the two witnesses and the petitioner as to the nature of the strike and his connection with it. I didn't think on their testimony there was sufficient to bar a man from citizenship under his statement. They had been examined in the first place; they came up; each witness testified about the strike. They were examined again at considerable length by the examiner and me. I will state that the examiner took a very belligerent attitude.

"Q. At the time of the examination you did not consider that there was sufficient before you to justify your admitting him to citizenship? A. Yes; I think, possibly, the continuance was taken at the request of the examiner, possibly on my own initiative.

"Q. If you were satisfied in your own mind, Judge, that the applicant was a proper person to receive his papers, what purpose did you have in conducting a personal investigation? A. So as to be satisfied that I was doing the right thing.

"Q. Then you were not satisfied at the end of the hearing? A. Oh, yes; I was. I wanted to let the matter cool off. There developed quite an acrimonious discussion at that time.

"Q. Did Mr. Hardy and Mr. Dyer, both witnesses, testify at that hearing that the applicant was an I. W. W.? A. They did not.

"Q. Did they testify that he was attached to the principles of the Constitution, and, in their opinion, would make a good citizen? A. With the qualification: There was a reservation that—they had always thought and still thought that he was a man of good character and would make a good citizen, with the exception of this matter, which the petitioner claimed was unfounded."

Upon an adjourned hearing defendant's two witnesses testifying at the naturalization hearing appeared before this court and testified, but their testimony was not reported. The material part of their evidence was that they had testified at the naturalization hearing; that their opinion of defendant's fitness to become a citizen changed between the time of making affidavit in support of defendant's petition for citizenship and the hearing thereon; that in the affidavit they swore in 1917 that they had personally known the petitioner since 1909, and that to their personal knowledge he was a person of good moral character, attached to the principles of the Constitution of the United States; that he was in every way qualified in their opinion to be admitted to be a citizen of the United States; that their reason for such change was that between the time of making such affidavit and the hearing in the naturalization proceeding in 1917 before the court, petitioner and his men had quit the work of forwarding material needed in filling a contract, in which the witnesses were interested, for lumber for the government at Camp Lewis; further, that in such interval they had heard that petitioner had taken part in an I. W. W. strike in another mill, acting as one of the pickets with an I. W. W. badge on his hat or cap, and that he was conducting a rooming house frequented by a number of I. W. W.

Early in the enforcement of the act of 1906 (34 Stat. 596), and particularly section 15 thereof (Comp. St. § 4374), there arose two lines of decisions on the question as to the effect of an order of naturalization, to what extent the rule of estoppel or res judicata could be successfully invoked against the government in a suit brought under section 15. But it is concluded that the questions which might have been once raised on account of this division of authority have been, all but laid at rest by the recent decisions by the Supreme Court of the United States, and particularly so since that of United States v. Ness, 245 U. S. 634, 37 Sup. Ct. 18, 61 L. Ed. 538. The following review of a number of cases will disclose the trend and scope of these divergent lines of authority:

In Grahl v. U. S. (C. C. A.) 261 Fed. 487, the petitioner for naturalization was an enemy alien who was naturalized while the country was at war with the country of which he was subject, contrary to the statute. His certificate was canceled.

In U. S. v. Leles (D. C.) 227 Fed. 189, the affidavit upon which the United States attorney filed his bill charged that the affiant believed that the holder of the certificate was not a person of good moral character, and that affiant was informed and believed that the witnesses were not examined in open court. The affidavit was held sufficient to support the bill. In this case Judge Van Fleet, upon authority of Johannessen v. U. S., 225 U. S. 227, 32 Sup. Ct. 613, 56 L. Ed. 1066,

held that the proceeding under section 15 was proper to correct mere irregularities as well as by appeal; that an order admitting to citizenship was a judgment only in form.

In the same case (236 Fed. 784), Judge Van Fleet, trying the case upon the merits, heard evidence as to the character of the petitioner; that is, the court reconsidered the question of the petitioner's good character and held it bad, although the state court (the court of naturalization) had held it shown to be good. The court further held that the state court erred in appointing a commissioner to take the testimony of certain character witnesses, and that the judge would not be heard to say that he was not influenced in his ruling admitting such petitioner by such testimony. Regarding the proceedings in the state court now under consideration, the judge testified:

"The petitioner appeared after the departure of the examiner, about noon. Whether I took it up at 1 o'clock or not, I don't know. It was after the examiner had gone. In the meantime, between the two hearings, I had talked with various officers. I had formerly lived in Hoquiam before being appointed to the bench. I talked to a good many who knew the man, and they recommended him very earnestly. They thought that Mr. Hardy, the superintendent, was mistaken in his attitude. Mr. Dyer, the other witness, at that time had joined the Twentieth Engineers and gone to France. Whether he called me up on the telephone or wrote me a letter, I don't remember. I am informed now that he did write me a letter. At any rate, in talking to Mr. Dyer—the two witnesses were not there at the time of the second hearing—he told me that he would withdraw any objections; that upon reconsideration he had found that he was mistaken in the attitude he had taken, but subsequent to my investigation. I ordered the admission at that time."

In U. S. v. Griminger (D. C.) 236 Fed. 285, it was held that the United States District Court was authorized to review the action of the state court in issuing a certificate to one whom the federal court concluded had not resided in the United States for five years "continuously" preceding the filing of his petition, although the court of naturalization had concluded that he had so resided, and the petitioner had made candid disclosure of the facts to the court granting the certificate. There was a mere difference of opinion in the two courts upon the question of the length of absence and intent of the petitioner as affecting the claim of continuous residence—a clear case of review on questions of law and fact.

In U. S. v. Nopoulos (D. C.) 225 Fed. 656, it was held that the federal District Court had jurisdiction to set aside a certificate of naturalization issued by a state court, even if the right of appeal existed.

In U. S. v. Simon (C. C.) 170 Fed. 680, the certificate granted by a state court was canceled upon the ground that the five years' continuous residence prior to filing the petition for naturalization was broken, because of seven months' physical absence, during which time the petitioner secured naturalization in a foreign country. Held to be voidable either on the ground of fraud or as "illegally procured."

In U. S. v. Plaistow (D. C.) 189 Fed. 1006, the certificate of naturalization of the state court was canceled because granted an alien, although he had not served a full term of enlistment in the Marine Corps, on a certificate of honorable discharge and proof of good character, without a previous declaration of intention to become a citizen.

In U. S. v. Schurr (D. C.) 163 Fed. 648, the certificate of naturalization was canceled where the court, having jurisdiction in a certain county, while holding court therein admitted to citizenship one residing in another county.

The certificate of naturalization in U. S. v. Van Der Molen (D. C.) 163 Fed. 650, was canceled because the petition for naturalization was filed less than two years after the declaration of intention, although the hearing thereon was after the expiration of the two years.

In U. S. v. Nisbet (D. C.) 168 Fed. 1005, the certificate of naturalization was canceled because the state court permitted depositions as to residence as to a portion of the five-year period in such state, whereas section 10 of the act only authorizes depositions as to residence in other states than that of naturalization.

The decision in U. S. v. Kolodner, 204 Fed. 240, 124 C. C. A. 1, was substantially to the same effect as Judge Hanford's decision in the foregoing case.

In U. S. v. Cantini, 212 Fed. 925, 129 C. C. A. 445, the question of whether the defendant petitioner's five years residence had been continuous was held to be one of fact, and the lower court was reversed for holding that an absence of two years, coupled with the intention of returning to the United States, constituted continuous residence.

U. S. v. Mulvey, 232 Fed. 513, 146 C. C. A. 471, was a case very similar to the foregoing. The court considered the further fact that the naturalization examiner had objected to the naturalization and disclosed the extent of petitioner's absence during the five-year period, notwithstanding which the Circuit Court of Appeals of the Second Circuit reversed the lower court for dismissing the bill for cancellation of the certificate. In his dissenting opinion in the foregoing case Judge Hough includes all of the grounds relied upon by the opposing decisions. He points out that Justice Marshall in Spratt v. Spratt, 4 Pet. 393, 7 L. Ed. 897, said of an order of naturalization:

"This judgment is entered on record as the judgment of the court. It seems to us, if it be in legal form, to close all inquiry, and, like every other judgment, to be complete evidence of its own validity."

He further says of the words "illegally procured" appearing in section 15 of the statute:

"Procedure by this independent suit, instead of appeal from the naturalization order, is said to be justified by section 15 of the Naturalization Law, which authorizes and directs the institution of proceedings demanding the cancellation of certificates of citizenship 'on the ground of fraud or on the ground that such certificate was illegally procured.' There is a plain difference between illegality and irregularity or error. 'Illegality' signifies 'that which is contrary to the principles of law, and denotes a "complete defect in the proceedings."' People v. Kelly, 1 Abb. Prac. N. S. (N. Y.) 437. 'Irregularity is want of adherence to some prescribed rule. * * * Illegality is predicable of radical defects only, and signifies that which is contrary to the principles of law, as distinguishable from mere rules of procedure.' Ex parte Mooney, 26 W. Va. 40, 53 Am. Rep. 59. 'Erroneous' connotes merely a mistake in the application of the law or the ascertainment of fact" (232 Fed. at pages 520, 521, 146 C. C. A. at pages 471, 478)

—and concludes:

"The majority decision herein gives to the United States (but not to the applicant) a choice of two methods of correcting errors in naturalization: It may either appeal direct or bring an action such as this, wherein it is sought (in effect) to reverse one decree by the entry of another, oftentimes in the same court. A more disorderly and undesirable practice I cannot imagine, and I believe it also to be unjustifiable, because section 15 of the act authorizes suits of this kind only for fraud and illegality, and not for the correction of error."

Notwithstanding the cogency and strength of his reasoning, I am constrained to hold to the contrary by the greater weight of authority, particularly in view of the decision of the Supreme Court in the recent case of United States v. Ness, 245 U. S. 319, 38 Sup. Ct. 118, 62 L. Ed. 321.

While Judge Hough points out two lines of decisions as to the right of review, and Judge Buffington points out in U. S. v. Neugebauer, 221 Fed. 938, 137 C. C. A. 508, that the government had sought no review by the Supreme Court of the dismissal of the writ of error sued out by it in U. S. v. Dolla, 177 Fed. 101, 100 C. C. A. 521, my attention has been called to no decision of the Supreme Court on the question of the right of appeal from an order of naturalization. That these cases were not taken to the Supreme Court may have been because of the adoption of the Judicial Code about that time, by which the Circuit Courts were abolished.

In Petition of Briese (D. C.) 267 Fed. 600, the court refused naturalization because the declaration of intention was not filed in the court having jurisdiction over the petitioner's place of residence.

The certificate in U. S. v. Mueller, 246 Fed. 679, 158 C. C. A. 635, was canceled because the petition was not filed within seven years after the making of the declaration of intention. It was held that the time would not be enlarged on account of mistake in filing such petition in a jurisdiction not of his residence.

In U. S. v. Gulliksen, 244 Fed. 727, 157 C. C. A. 175, the bill of complaint for cancellation of the certificate was held sufficient, alleging that upon the hearing, when it developed that one of the witnesses had not known the applicant five years, another witness was substituted whose affidavit was not attached to the petition.

The case reviewed in Johannessen v. U. S., 225 U. S. 227, 32 Sup. Ct. 613, 56 L. Ed. 1066, was one where the certificate of naturalization had been secured prior to the act of 1906 upon false testimony as to the five years' residence. The Supreme Court points out that such proceeding was "without notice to the government, and without opportunity, to say nothing of duty, on the part of the government to appear" (225 U. S. at page 237, 32 Sup. Ct. 613, 615 [56 L. Ed. 1066]), and that what was said by Justice Marshall in Spratt v. Spratt, 4 Pet. 393, 408, 7 L. Ed. 897, relied upon by Judge Hough in his dissenting opinion (U. S. v. Mulvey, 232 Fed. 520, 146 C. C. A. 471), was said in view of the fact that there the attack was collateral, and not a direct attack, as provided by section 15.

While the Supreme Court in the Johannessen Case stresses the fact

that by the law of 1906 (section 11 [Comp. St. § 4370]) the United States is given the right to appear in naturalization proceedings and cross-examine the petitioner's witnesses, and the reservation goes to any case where the government has appeared and litigated the matter, yet the following language used by the court in that decision, five years after the enactment of the law of 1906, would appear suggestive:

"Sound reason, as we think, constrains us to deny to a certificate of naturalization, *procured ex parte in the ordinary way*, any conclusive effect as against the public. Such a certificate, including the 'judgment' upon which it is based, is in its essence an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been *unlawfully* or fraudulently procured. It is in this respect closely analogous to a public grant of land (Rev. Stat. § 2289, etc.), or of the exclusive right to make, use, and vend a new and useful invention (Rev. Stat. § 4883, etc.)." 225 U. S. at page 238, 32 Sup. Ct. at page 615 (56 L. Ed. 1066): (Italics ours.)

The court also indicates that no narrow meaning will be attached to the words "illegally procured" by paraphrasing the former word with "unlawfully." The court says:

"*He can only become a citizen upon and after a strict compliance with the acts of Congress. An applicant for this high privilege is bound therefore, to conform to the terms upon which* alone the right he seeks can be conferred. It is his province, and he is bound, to see that the jurisdictional facts upon which the grant is predicated actually exist, and if they do not he takes nothing by his paper grant." 225 U. S. at page 240, 32 Sup. Ct. at page 616 (56 L. Ed. 1066). (Italics ours.)

Also:

"The act does not purport to deprive a litigant of the fruits of a successful controversy in the courts; for, as already shown, the proceedings for naturalization are not in any proper sense adversary proceedings, but are ex parte and conducted by the applicant for his own benefit. The act in effect provides for a new form of judicial review of a question that is in form, but not in substance, concluded by the previous record, and under conditions affording to the party whose rights are brought into question full opportunity to be heard." 225 U. S. at page 241, 32 Sup. Ct. at page 617 (56 L. Ed. 1066).

In using the latter language, the court had in mind and was describing the act, its purpose and scope, and not as confined to and applied to a case where naturalization had been obtained prior to the act of 1906.

In Luria v. U. S., 231 U. S. 9, 34 Sup. Ct. 10, 58 L. Ed. 101, the case was one where the lower court had vacated a certificate of naturalization secured in 1894 under the old act, in which act there was no requirement, as in the act of 1906, that the applicant should intend to reside permanently in the United States. The lower court, giving effect to section 15 of the act of 1906, making the taking up of permanent residence within five years after naturalization in a foreign country prima facie evidence of a lack of intent to become a permanent citizen of the United States at the time of filing his application for citizenship, in the absence of countervailing evidence, canceled the certificate. 184 Fed. 643.

It was contended in the Supreme Court that, so construed, the act was unconstitutional. It is obvious that the lower court considered

and determined what was the petitioner's intention concerning residence at the time of his naturalization, and held the certificate to have been "procured illegally," though there was no express requirement at the time of naturalization that the applicant should intend to reside permanently in the United States; but the Supreme Court held:

"It is true that section 4 of the act of 1906 exacts from the applicant a declaration of his intention to reside in the United States, and it is also true that the prior laws did not expressly call for such a declaration. But we think it is not true that under the prior laws it was immaterial whether the applicant intended to reside in this country or presently to take up a permanent residence in a foreign country. On the contrary, by necessary implication, as we think, the prior laws conferred the right to naturalization upon such aliens only as contemplated the continuance of a residence already established in the United States. * * *

"These requirements (that is, the provisions as to declaration of intention, petition for naturalization, and hearing thereon) plainly contemplated that the applicant, if admitted, should be a citizen in fact as well as in name; that he should assume and bear the obligations and duties of that status as well as enjoy its rights and privileges. In other words, it was contemplated that his admission should be mutually beneficial to the government and himself; the proof in respect of his established residence, moral character, and attachment to the principles of the Constitution being exacted *because of what they promised for the future, rather than for what they told of the past.*"

231 U. S. at pages 22, 23, 34 Sup. Ct. at page 13 (58 L. Ed. 101). (Parentheses and italics ours.)

"By the clearest implication those laws show that it was not intended that naturalization could be secured thereunder by an alien whose purpose was to escape the duties of his native allegiance without taking upon himself those of citizenship here, or by one whose purpose was to reside permanently in a foreign country and to use his naturalization as a shield against the imposition of duties there, while by his absence he was avoiding his duties here. Naturalization secured with such a purpose was wanting in one of its most essential elements—good faith on the part of the applicant. It involved a wrongful use of a beneficent law. True, it was not expressly forbidden; neither was it authorized. *But, being contrary to the plain implication of the statute, it was unlawful, for what is clearly* implied is as much a part of a law as what is expressed." 231 U. S., at pages 23 and 24, 34 Sup. Ct. at page 13 (58 L. Ed. 101). (Italics ours.)

In U. S. v. Ginsberg, 243 U. S. 472, 37 Sup. Ct. 422, 61 L. Ed. 853, it was held, under the requirement of section 9 of the act (Comp. St. § 4368) "that every final hearing upon such petition shall be had in open court before a judge or judges thereof, a certificate was rightly canceled where, after the petition was presented in open court, a hearing thereon was passed and finally heard in chambers, which adjoined the courtroom. From this it must be concluded that it is error to hold any inquiry upon the hearing, in whole or in part, other than in open court.

In U. S. v. Ness, 245 U. S. 319, 38 Sup. Ct. 118, 62 L. Ed. 321, the lower court had dismissed the government's bill praying cancellation of the certificate; the ground for cancellation alleged being that no certificate of arrival, as required by section 4 of the act, had been filed with the clerk. The naturalization had been heard in 1912, under the act of 1906. The Supreme Court, in reviewing the lower court, appears to have disposed of the questions of estoppel and res judicata contended for and left open by the Johannessen Case, supra.

Under the provisions of section 11 the Naturalization Examiner had

raised the question in the court of naturalization and opposed it. The court says (concerning the questions presented):

."Whether an order entered in a proceeding to which the United States became a party under section 11 is res judicata as to matters actually litigated therein, so that the certificate of naturalization cannot be set aside under section 15, as having been 'illegally procured.'

"This question, discussed and left undecided in Johannessen v. United States, 225 U. S. 227, 238, is, in effect: Do section 11 and section 15 afford the United States alternative or cumulative means of protection against illegal or fraudulent naturalization under the act of June 29, 1906?

"The remedy afforded by section 15 for setting aside certificates of naturalization is broader than that afforded in equity, independently of statute, to set aside judgments (United States v. Throckmorton, 98 U. S. 61; Kibbe v. Benson, 17 Wall. 624); but it is narrower in scope than the protection offered . under section 11. Opposition to the granting of a petition for naturalization may prevail, because of objections to the competency or weight of evidence or the credibility of witnesses, or mere irregularities in procedure. A decision on such minor questions, at least of a state court of naturalization, is, though clearly erroneous, conclusive even as against the United States if it entered an appearance under section 11. For Congress did not see fit to provide for a direct review by writ of error or appeal. But where fraud or illegality is charged, the act affords, under section 15, a remedy by an independent suit 'in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit.' If this suit is brought in the federal District Court, its decision will also be subject, under the general law, to review by the Circuit Court of Appeals, and, on certiorari, by this court. Such an independent suit necessarily involves considerable delay and expense; and it may subject the individual to great hardship. On the other hand, a contest in the court of naturalization is usually disposed of expeditiously and with little expense. The interest of all concerned is advanced by encouraging the presentation of known objections to naturalization at the earliest possible stage of the proceedings; so that the petitioner may, if the defects are remediable, remove them, and, if not, may adopt, without delay, such course, if any, as will ultimately entitle him to citizenship. It would have defeated this purpose to compel the United States to refrain from presenting any objection, or the objection of illegality, in the. court of naturalization, unless it is willing to accept the decision of that court as final.

"It was the purpose of Congress, by providing for appearances under section 11, to aid the court of naturalization in arriving at a correct decision ' and so to minimize the necessity for independent suits under section 15. In most cases this assistance could be given best by an experienced examiner of the Bureau of Naturalization familiar with the sources of information. Section 11, unlike section 15, does not specifically provide that action thereunder shall be taken by the United States district attorneys; and if appearance under section 11 on behalf of the government should be held to create an estoppel, no good reason appears why it should not arise equally whether the appearance is by the duly authorized examiner or by the United States attorney. But in our opinion section 11 and section 15 were designed to afford cumulative protection against fraudulent or illegal naturalization. The decision of the Circuit Court of Appeals is therefore reversed."

245 U. S. at pages 325–327, 38 Sup. Ct. at page 121 (62 L. Ed. 321).

Among the following are cases which the defendant contends require a different determination than that which has been reached by the court:

It is true that in U. S. v. Albertini (D. C.) 206 Fed. 133, the court said that, in order for a certificate to be "illegally procured," it must have been "issued by a court without jurisdiction or in violation of the law's procedure, without a petition or witnesses, or notice, or hearing, for example." (206 Fed. at page 135), but in that case the

court canceled the certificate of naturalization on the ground of fraud in its procurement because the petitioner had concealed from the court upon his naturalization the fact of his abandonment of his wife and family. He had, when asked if he was married, falsely denied it. The trial court concluded that the abandonment during the five years preceding the naturalization was immoral; but, notwithstanding that the finding of this fact was a matter intrinsic to the record, the court having reached this determination, it is apparent that the language above quoted probably was not considered with the same seriousness as it would have been if it had been determinative of the cause.

In U. S. v. Luria (D. C.) 184 Fed. 643–646, the court, in speaking of the statutory words "illegally procured," says the words mean "procured by subornation or some other illegal means used to impose upon the court," but in this case the conclusion reached by the court shows that such statement was not in direct line with the decision, but used in a more or less general discussion of the law. The ruling was that the government, having shown that the defendant had, within five years after naturalization, taken up his permanent residence in South Africa, under the statute, such fact was prima facie evidence of fraud in the procurement of his naturalization, and, as there was no countervailing evidence, the certificate was canceled for such fraud. Such being the record in that case, it is obvious that there was no need to determine the general scope of the words "illegally procured."

Counsel has also cited U. S. v. Ness (D. C.) 217 Fed. 169, to the point that an order of naturalization is res judicata. This decision supports him in his position, but it was reversed by the Supreme Court in 245 U. S. 319, 38 Sup. Ct. 118, 62 L. Ed. 321.

In U. S. v. Andersen (D. C.) 169 Fed. 201, the cancellation of a certificate was refused, although a state court sitting in a county other than that of petitioner's residence had naturalized him. But in that case there were two counties in the judicial district, one the county of the petitioner's residence, and the other the one in which the court was sitting when it naturalized him. This was held to be a sufficient compliance with the statutory provision that the jurisdiction of the court of naturalization "shall extend only to aliens resident within the respective judicial districts of such courts." It is true that in the foregoing decision, Judge Dietrich concluded that, under section 15, concurrent, and not revisory, jurisdiction was conferred. The same judge, following U. S. v. Albertini (D. C.) 206 Fed. 133, held in U. S. v. Butikofer (D. C.) 228 Fed. 918, in a suit under section 15 praying cancellation of a certificate on the ground that the applicant was under 21 years of age:

"In United States v. Albertini, 206 Fed. 133, it was held that the phrase 'illegally procured' imports 'a certificate issued by a court without jurisdiction or in violation of the law's procedure—without petition, or witnesses, or notice, or hearing, for example.' The Utah court had jurisdiction, and in so far as appears its procedure was regular; no fraud was practiced. For these reasons alone the decree must be held to be unassailable."

In U. S. v. Jorgenson (D. C.) 241 Fed. 412, Judge Sessions dismissed the petition praying cancellation; the ground set up therein being that

during the five years preceding naturalization the applicant had been absent from the United States in the Canal Zone over three years. Judge Sessions found that at all times during such absence it was applicant's intention to return to the place of his residence, and that on two occasions he did return to his residence and for naturalization, and, upon the strength of the showing as to his intention in this respect, distinguished the case from U. S. v. Mulvey, 232 Fed. 513, 146 C. C. A. 471. Judge Sessions noted the further distinction that the intention of the requirement of continuous residence was, in part, to insure the applicant's familiarity with our mode of government, and the petitioner in that case was, because of the nature of his work for the government in the Zone, afforded a good opportunity to obtain the needed knowledge, which opportunity the defendant in the Mulvey Case did not have during his absence. It is apparent that what the court says in this last particular is in no sense an attempt to set up under the court's judgment something just as good as that which Congress had provided in its requirement, continuous residence, but that the language was used as an answer to what had been said arguendo by Judge Rogers in the Mulvey Case. Judge Sessions finds, expressly, five years' continuous residence by virtue of the ever-present intention of the applicant to return to the United States, notwithstanding his three years' physical absence in the Canal Zone.

In U. S. v. Lenore (D. C.) 207 Fed. 865, the court dismissed the bill for cancellation. The naturalization had been in the state court. The bill averred that the petitioner had signed by her mark, and "not in her own handwriting," as required by the statute. This is admitted by the answer. The substance of the court's ruling is shown by the following from the opinion:

"To say that a certificate which is issued pursuant to a full hearing in court is 'illegally procured,' if any error occurs in the proceeding, would be a wide departure from the language which courts have been accustomed to use in referring to judicial error. 'Illegally procured' imports, not an error of court, but willful misconduct on the part of the holder of the certificate or those who have acted in his behalf. The history of the statute shows that its language can be given full effect according to the mischief that was present to the thought of Congress, without upsetting the whole judicial system that has hitherto obtained among courts of co-ordinate jurisdiction. I am therefore unable to follow the decisions in United States v. Meyer (D. C.) 170 Fed. 983, United States v. Plaistow (D. C.) 189 Fed. 1007, and United States v. Schurr (D. C.) 163 Fed. 648. I concur in the view expressed in United States v. Luria (D. C.) 184 Fed. 643, 646, that ' "illegally procured" does not mean that the certificate was issued through error of law.' Errors of courts, committed in the honest exercise of their jurisdiction under the naturalization laws, must be corrected the same as in other cases by appeal or writ of error." At page 868.

In one respect the case of U. S. v. Stoller (D. C.) 180 Fed. 910, was similar to U. S. v. Andersen (D. C.) 169 Fed. 201, supra; but other illegalities claimed in the procurement of the certificate were that it was issued prior "to final order under the hand of a court having jurisdiction" as required by sections 9 and 18 of the act (Comp. St. §§ 4368, 4375), and that the petition for naturalization had not been filed in duplicate as required by section 4 (section 4352).

A further review of the cases seems unnecessary.

[1] It is shown both by the evidence of the defendant's witnesses upon the naturalization hearing and that of the presiding judge that neither of these witnesses would testify that, in their opinion, the applicant was well disposed to the good order and happiness of the United States and in every way qualified in their opinion to be admitted as a citizen of the United States. It is true that they said that they considered him so with one exception; that is, his connection with the activities of certain members of the I. W. W. organization.

Section 4 of the act of June 29, 1906, requires that the petition for naturalization shall be verified by the affidavits of at least two credible witnesses who are citizens of the United States, and who shall state in their affidavits that they have personally known the applicant to be a resident of the United States for a period of at least five years continuously, and of the state, territory, or district in which the application is made for one year, immediately preceding the date of filing the petition, and that each has personal knowledge that the petitioner is a person of good moral character, and that he is in every way qualified, in their opinion, to be admitted as a citizen of the United States. It is further required:

"It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least, and within the state or territory where such court is at the time held one year at least, and that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. In addition to the oath of the applicant, the testimony of at least two witnesses, citizens of the United States, as to the facts of residence, moral character, and attachment to the principles of the Constitution shall be required, and the name, place of residence, and occupation of each witness shall be set forth in the record." 34 Stat. at L. 598; Comp. St. § 4352(4).

Section 5 requires that the names of the witnesses shall be posted. Section 7 requires:

"That no person who disbelieves in or who is opposed to organized government, or who is a member of or affiliated with any organization entertaining and teaching such disbelief in or opposition to organized government, or who advocates or teaches the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the government of the United States, or of any other organized government, because of his or their official character, or who is a polygamist, shall be naturalized or be made a citizen of the United States." 34 Stat. at L. 598, 599; Comp. St. § 4363.

There is nothing in the foregoing provisions that in any way warrants the contention that the witnesses may qualify their good opinion of the applicant. If they can recommend him in all respects save one, and he be admitted, why not two, three, or half a dozen? Clearly the spirit of the naturalization law requires upon the hearing that the two witnesses to the fact that the petitioner is of good moral character and attached to the principles of the Constitution of the United States shall be able to say that the applicant is attached sufficiently to such principles to be, in their opinion, in every way qualified to be ad-

mitted as a citizen as required in their affidavits to the petition. The act requires, in addition to their testimony, that the court shall be able to find upon the hearing from all the evidence that the applicant is of good moral character and attached to the principles of the Constitution and qualified to be admitted as a citizen of the United States. No intent is shown and no reason suggested why less should be required from the witnesses upon the hearing than is required of them in the preliminary affidavit.

The spirit of the law requires that upon the hearing they shall, in person, in open court, positively support their preliminary affidavits to the effect that, in their opinion, the petitioner is in every way qualified to be admitted as a citizen. The requirement is not that they shall testify that he is qualified in every way considered necessary in the opinion of the court, but qualified in every way in their, the witnesses' opinion. The government wants no citizen whom his own selected friends cannot whole-heartedly recommend. Witnesses may feel that they know the petitioner sufficiently well to say of their own personal knowledge that he is a man of good moral character, but, in the very nature of things, in the vast majority of cases, the court must depend upon good reputation of the petitioner as vouched for by these witnesses, as the best evidence of good character, and, if the two witnesses of the petitioner, chosen by himself, plainly show themselves unwilling to positively and unequivocally state that the petitioner has a good reputation in the community where he lives, and that they themselves believe him to be a man of good moral character in all respects, and that his neighbors think well of him, and that he is in every way qualified in their opinion to be admitted, they have disqualified themselves as witnesses in his behalf, at least unless it develops that their reason for not so doing is entirely groundless or whimsical.

[2] Certainly petitioner's connection with the activities of members of the I. W. W. organization—obstructing the prompt delivery of material needed in the prosecution of the war—under the terms of section 4 is in no sense a fanciful objection. It makes no difference whether the knowledge which kept the witnesses from positively vouching for the petitioner came to them after making affidavit to the petition, or that it was in part upon hearsay, for reputation can only be established by hearsay.

[3] It is the court's conclusion that the certificate was illegally procured, both because of the failure of these witnesses to testify substantially as required by the statute to authorize naturalization, and on the further ground that the court had no warrant to prosecute any inquiry in the matter, save in open court.

[4] The question remains whether, in a proceeding such as the present, the court should set up its judgment in the foregoing particulars over that of the state court. It is, no doubt, a delicate question, and must be determined from the intention of Congress as expressed by section 15 of the act of 1906, as the same has been construed by the courts.

The great majority of the foregoing cases show how strict has been the enforcement of each one of the preliminary requirements expressed

in the statute, and that, for such purpose, the District Court will review naturalization proceedings in a suit brought with that intention.

These various steps required of the aliens in naturalization proceedings are only the means to an end; that is, the preparation for and insurance of a fair and thorough hearing upon the question of the applicant's fitness for citizenship. To safeguard by provisions for review these means and leave the hearing itself and the sufficiency of the evidence thereat unguarded would be as one who would save the frame and throw away the picture. Why take pains to give the government an opportunity to look up the petitioner and his witnesses and their antecedents, if upon the hearing the petitioner is to obtain his certificate, though the witnesses fail to give the evidence the statute requires?

In reaching this conclusion I have not overlooked the following language used by Justice Brandeis in U. S. v. Ness, 245 U. S. 319, at pages 325 and 326, 38 Sup. Ct. 118, at page 121 (62 L. Ed. 321), and already quoted:

"Opposition to the granting of a petition for naturalization may prevail, because of objections to the competency or weight of evidence or the credibility of witnesses, or mere irregularities in procedure. A decision on such minor questions, at least in a state court of naturalization, is, though clearly erroneous, conclusive even as against the United States if it entered an appearance under section 11. For Congress did not see fit to provide for a direct review by writ of error or appeal."

As the result of the Supreme Court's decision in this case was the reversal of the lower court and cancellation of the certificate, it is obvious that the statement last quoted is dictum. I conclude that Justice Brandeis in the foregoing was referring to such general matters as are bound to arise at any hearing before the court requiring rulings on evidence and that he in no way intended to hold that a judge, upon a naturalization hearing, could supply by a finding what these statutory witnesses fail to supply in the way of evidence.

The certificate will be canceled; but, as the defect is a failure of proof, rather than proof of unfitness for citizenship, the decree will provide that the cancellation is without prejudice.