UNITED STATES of America, Plaintiff,

v.

Feodor FEDORENKO, Defendant.

No. 77-2668-Civ-NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

July 25, 1978.

J. V. Eskenazi, U. S. Atty., Alan M. Lubiner, Gen. Atty. (Nationality) Immigration & Naturalization Service, Miami, Fla., for plaintiff.

Gregg J. Pomeroy, Fort Lauderdale, Fla., Celentano & Gildea, New Haven, Conn., for defendant.

ROETTGER, District Judge.

The Government seeks to strip defendant of his American citizenship granted in 1970. Basically the Government charges that defendant lied on his application for a visa in 1949, particularly in not disclosing he served as a guard at the death camp at Treblinka during World War II. Further, the Government charges he participated in atrocities at Treblinka, precluding him from having the good moral character necessary to become an American citizen. Defendant, originally a Ukrainian, contends that he was not a guard voluntarily but he was forced to be one as a prisoner of war of

Nazi Germany and denies committing any atrocities at Treblinka or elsewhere.[1]

## DEFENDANT'S CONDUCT IN AMERICA

Defendant Fedorenko came to America in 1949 and has been a respectable resident ever since. Following his arrival he worked on a farm in Connecticut. After a year he worked in a factory in Waterbury and then went to work for Scovill, a manufacturer of brass and copper products; he worked there, usually as a foundry worker, for 20 years until his retirement. He was emphatically described by fellow-workers at Scovill as an "excellent" worker who did not speak unkindly of anyone; that he was so good a worker he had no problems and was a "real gentleman" with no apparent prejudices of any type. The union representative at Scovill testified strongly as to his reliability and performance—a man who never put in a grievance and never had one filed against him. His foreman described defendant as a man who did his job well and cheerfully—a very conscientious and a very good worker.[2] The court accepts these appraisals as accurately reflecting defendant's work-life and personal life for 29 years.

The defendant married while in America but his American wife has died. For background: until the early 1960's defendant believed his wife and two children in Russia had been killed during World War II. He had been so advised at a prisoner of war camp by two brothers from his home town. He has since discovered his wife and sons are alive and living in Crimea; he has visited them in the 1970's. His only schooling was in his native Ukraine for three years from 1915 to 1918, during the defeat and collapse of Czarist Russia.

Defendant has retired on a social security pension and a pension from his 20 years labor at Scovill. He doesn't own a car; he doesn't own a house; he owns no real estate except a cemetery lot, and he has a burial insurance policy. He has accumulated a life savings of $5,000 but owes his attorney an unknown fee for a trial which lasted 14 days. He has never been arrested in 29 years—not even for a traffic offense. His one failure as a resident and citizen in 29 years: he received one parking ticket. Feodor Fedorenko has been a hard-working and responsible American citizen.

## VENUE AND PRELIMINARY MATTERS

This suit was instituted in August, 1977 while defendant was a resident in Miami Beach, pursuant to the requirement of 8 U.S.C. § 1451 (a) that suit be filed "in the district in which defendant resides." Defendant challenged venue on the grounds that his presence in Miami Beach, where he was then living, was only temporary and that his permanent residence was in Waterbury, Connecticut. The court denied defendant's motion to transfer, holding that venue properly lay in the Southern District of Florida.[3]

However, in an effort to alleviate defendant's claim of financial hardship in producing witnesses in Florida the court—through the gracious hospitality of the United States District Court for the District of Connecticut—held a portion of the trial in Waterbury.[4] Although the hearing in Con-

1. This memorandum opinion contains the court's findings of fact and conclusions of law in compliance with Rule 52, F.R.C.P. In addition, the court has included considerable detail about the evidence because of the extensive review of evidence afforded to the Supreme Court and Court of Appeals in denaturalization cases. *U.S. v. Nowak*, 356 U.S. 660, 78 S.Ct. 955, 2 L.Ed.2d 1048 (1958) and others. Further, the court has added observations to give the flavor of the trial as well.

2. The only reference to World War II by defendant any fellow-worker remembers was when he cried about the loss of his wife and sons.

3. Although the Government produced only minimal proof to justify denial of the motion, defendant admitted at trial that he was a resident of Miami Beach from August 1976 to September 1977 after suit was filed.

4. The court appointed itself a special master under Rule 53 F.R.C.P. for the purpose of holding a hearing and receiving evidence in Waterbury. The parties stipulated that the evidence

necticut was originally scheduled to follow presentation of the Government's case in Fort Lauderdale in April, the Government's case was postponed until late May and June because of a recent appearance by Florida defense counsel.[5]

Consequently, part of defendant's case was heard out of turn prior to the presentation of the Government's case in Fort Lauderdale without objection by either side. Two government witnesses also testified in Waterbury without objection, as a convenience to the witnesses.

A second problem developed prior to trial with regard to the Government's obtaining testimony of foreign witnesses. Early in November 1977, the court learned of the Government's intention to take depositions out of the country. Because it was concerned that the Government might intend to produce only deposition testimony of foreign witnesses, the court *sua sponte* entered an order prohibiting the use of deposition testimony at trial in order to enable the court to observe the witnesses' faces, body language and reactions in the courtroom, particularly in the presence of defendant and also his reactions to their testimony. The court felt that in-court testimony would be particularly critical in view of possible identification problems and the passage of 35 years since the events complained of at Treblinka. In addition, depositions taken by the Government in Israel almost surely would not have provided cross-examination. In compliance with the

court's order the Government was compelled to bring its witnesses from Israel to Fort Lauderdale.[6]

## CHARGES AND DEFENSES

Title 8 U.S.C. § 1451 (a) provides that for good cause shown the United States Attorney shall institute proceedings to set aside an order admitting a person to citizenship and cancel the certificate of naturalization on the grounds that such order and certificate were "illegally procured or were procured by concealment of a material fact or by willful misrepresentation".

In Count 1 the Government charges that defendant gave false information in his application for Immigration Visa and Alien Registration, and that his citizenship was therefore "illegally procured" because he was never lawfully admitted to the United States.

Counts 2 and 3 allege that defendant was not admissible to the United States under the Displaced Persons Act of 1948, Pub.L. No. 80–774, 62 Stat. 1009, nor was he otherwise admissible under the Immigrations Laws and Orders and Regulations issued thereunder because he participated in the commission of crimes and atrocities against civilians in the Treblinka concentration camp during 1942–43.

Count 4 alleges that defendant wilfully failed to disclose the commission of crimes at Treblinka in response to question #6 on

be received without the necessity of filing the report and further that it could be considered as if it had been presented at trial.

5. Defendant's initial counsel, Brian Gildea of New Haven, was permitted to withdraw after Gregg Pomeroy of Fort Lauderdale filed his appearance. However, Mr. Gildea assisted at the hearing in Connecticut.

6. The court in its order suggested that if the Justice Department wished to bear the expense of defendant and his counsel, and the court's as well, to hear testimony of the Israeli witnesses at some neutral site such as Athens or Istanbul, the court would be willing to do so as a Special Master. The Justice Department declined but the court has since been informed by Government counsel at the pretrial conference that it would have been more economical for them to

have done so inasmuch as they brought ten witnesses from Israel for the purposes of trial and most insisted on bringing their spouses as a condition of testifying.

Subsequent to the court's order regarding witnesses' testimony, the Judicial Conference of the United States passed a resolution at the March 1978 meeting prohibiting United States Courts from holding court outside the United States. In view of the expense problem of the Israeli witnesses, as well as the much more critical problem of obtaining testimony of the Russian witnesses discussed subsequently in this opinion, this court must respectfully suggest that special circumstances might justify authorization for a United States District Court to hold evidentiary hearings outside the United States for trial purposes.

his Application to File Petition for Naturalization (Form N-400).

In Count 5 the Government charges that defendant wilfully failed to disclose his service as an armed guard for the Germans in response to question #7 on the N-400 form.

Finally, Counts 6 and 7 allege that defendant lacked the good moral character required to become a citizen by virtue of his commission of atrocities at Treblinka and the giving of false statements with request to questions #6 and #7 as alleged in Counts 4 and 5.

## DEFENSES

Defendant Fedorenko in his answer raised the special defenses of waiver and estoppel, improper venue, and the statute of limitations. Primarily defendant contended that the long passage of time between the incidents at issue and the institution of this law suit served to bar the Government from proceeding. The defense of improper venue was based on the allegation that defendant did not reside in Florida at the commencement of this law suit.

At trial, defendant virtually abandoned these special defenses; instead he denied generally having committed atrocities or crimes against humanity while a prison guard at Treblinka. Also, defendant sought to establish that his service as a guard at Treblinka and elsewhere was performed involuntarily while he was himself a prisoner of war.

## BURDEN OF PROOF

Because of the importance of a loss of citizenship to the individual, a denaturalization proceeding is a most sensitive trial.

■■■ Thus, the burden of proof in denaturalization cases has been clearly stated by the Supreme Court in *Nowak v. United States*, 356 U.S. 660, 663, 78 S.Ct. 955, 957, 2 L.Ed.2d 1048 (1958), as follows:

Where citizenship is at stake the Government carries the heavy burden of proving its case by " 'clear, unequivocal, and convincing' evidence which does not leave 'the issue in doubt' * * *." *Schneiderman v. United States*, 320 U.S. 118, 158, 63 S.Ct. 1333, 1352, 87 L.Ed. 1796. "Especially is this so when the attack is made long after the time when the certificate of citizenship was granted and the citizen has meanwhile met his obligations and has committed no act of lawlessness." *Id.*, 320 U.S. at pages 122–123, 63 S.Ct. at page 1335.

As the Supreme Court has stated:

[Denaturalization cases] are extremely serious problems. They involve not only fundamental principles of our political system designed for the protection of minorities and majorities alike. They also involve tremendously high stakes for the individual. For denaturalization, like deportation, may result in the loss "of all that makes life worth living." (citation omitted) *Knauer v. United States*, 328 U.S. 654, 659, 66 S.Ct. 1304, 1307, 90 L.Ed. 1500 (1947).

## PUBLISHED POLICY CONCERNING DENATURALIZATION CASES

■■■ A failure to follow the published policy of the Department of Justice does not bar the bringing of the suit. *United States v. Nelligan*, 573 F.2d 251 (5th Cir. 1978). However, it is interesting to observe the policy of the Department of Justice with respect to bringing denaturalization cases:

In the opinion of the department, as a general rule, a good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.[7]

7. The statement of policy continues, as follows: The legislation referred to, being retroactive,[21] is construed to be remedial rather than penal in its nature; for the protection of the body politic

rather than for the punishment of the individuals concerned. Ordinarily, nothing less than the betterment of the citizenship of the country should be regarded as sufficient to justify the

The court cannot help but question the application of this policy towards defendant in view of his 29 years of lawful conduct—except for one parking ticket—and hard work here in America.

The court observed at the trial and iterates it here: never in six years on the bench has the court seen the Government indulge in such expenses as daily copy of the reporter's transcript of testimony or having four lawyers at the Government's counsel table.[8] Such expenditures of the taxpayers' treasure and talent have not occurred in this court's previous cases such as the prosecution of an alleged Mafia don, a continuing criminal enterprise case, the only dangerous special offender indictment in this district for the reputed salaried slayer for a narcotics importation gang which was responsible for at least 26 murders in the South Florida area according to the testimony in the District Court in Miami, as well as many other serious prosecutions.

Clearly the expenditure of the resources of the Executive Branch lies within the discretion of that branch of the Government. However, the court must venture that in view of the similarity in the burden of proof between criminal cases and denaturalization cases, and in view of what is at stake for the naturalized American citizen, the defendant in a denaturalization case ought to have the same resources that are provided a defendant in a criminal case under the Criminal Justice Act; in short the naturalized citizen—provided the defendant's financial condition warrants it—should receive the benefit of court-appointed counsel and other experts at the Government's expense.

One more observation needs to be made before moving to a consideration of the evidence. If ever a case supported the Judicial Conference ruling barring cameras from the courtroom, this case does. From the beginning it was like a Hollywood spectacular and polarized the residents of South Florida.

As an example of some of the emotional intensity surrounding the trial, the Jewish Defense League ran ads in newspapers offering chartered buses from Miami Beach to Fort Lauderdale on opening day. A demonstration outside the courtroom ensued with a chant: "Who do we want? Fedorenko. How do we want him? Dead." After the court was interrupted twice and the first three warnings were ignored by the demonstrators, a leader who was using an amplified bullhorn was arrested. A counter-demonstrator appeared two days later with an ensuing confrontation. If the trial had been brought into South Florida homes by television, the incidence of such confrontations likely would have increased.[9]

---

disturbance of personal and property rights which cancellation proceedings may occasion. This does not mean that such proceedings should not be instituted in any case where willful and deliberate fraud appears, as the perpetration of such fraud would indicate lack of the moral qualifications necessary for citizenship. If, however, many years have elapsed since the judgment of naturalization was apparently so procured, and the party has since conducted himself as a good citizen and possesses the necessary qualifications for citizenship, cancellation proceedings should not, as a rule, be instituted." Dept. of Justice Circular Letter No. 107 (Sept. 20, 1909), reprinted in Immigration and Naturalization Service Handbook at 6508, 08.1.

8. In addition, the Government, which bears the expense of translators, hired two Russian translators for defendant's testimony. The extra one sat behind Government counsel's table—another first.

The Government neither provided a copy of the daily transcript to defendant nor did it offer to provide a "back-up" translator when the Israeli witnesses testified.

9. Fortunately, the U.S. Marshal Service and the Fort Lauderdale Police Department had performed at their usual outstanding level of competence in maintaining courtroom decorum and order in the environs around the court facility. The deputy marshals even apprehended one news reporter going through the judge's wastebasket under the bench.

The court is unaware if the Government is bringing charges against the demonstrators under 18 U.S.C. § 1507.

## EVIDENCE AS TO DEFENDANT'S CONDUCT, 1941–1949 PRE–TREBLINKA [10]

Defendant was mobilized on June 23, 1941, almost immediately after the invasion of the Soviet Union by Nazi Germany. He was a truck driver and the truck he drove was also mobilized. He had no previous military training and in the next two to three weeks his group was encircled twice by the German Army. He escaped the first time but was captured three days later by the Germans with about one-third of his fellow Russian soldiers.

The Germans transported several truckloads of prisoners to Zytomir, a former Soviet training camp, and defendant described the conditions as very bad and with little water or food; the camp housed about 50,-000 to 100,000 prisoners, with no barracks available for them. After two to three weeks he was then transferred to Rovno for about 10 days where there were fewer people than at Zytomir; the camp was surrounded by electrified barbed wire.

Next he was transferred to Chelm, Poland, a camp also ringed by barbed wire rolls. The prisoners who tried to escape were trapped in the barbed wire and their plight was quite visible to fellow-prisoners in the morning. While at Chelm he worked in the kitchen, dug holes and built barracks. Defendant estimated the population at Chelm at about 80,000 prisoners.

Defendant described the conditions at Chelm as so bad that if you became ill you rarely recovered. He also indicated that food was at a minimum and that approximately 40,000 prisoners of war died over the winter of 1941–1942. Defendant testified that he supplemented his food intake by eating grass and roots.[11]

Defendant testified he would receive beatings from German soldiers when he didn't understand and comply with orders. On two occasions he was hit with a rifle butt, once when he went to pick up a beet and also when he picked up an apple a Polish citizen had thrown. Defendant testified the conditions at Chelm were so bad that he would have died if he had not been transferred to Travnicki.

One day at Chelm the Germans assembled the Russian prisoners and walked down the line selecting 200 to 300 who were sent on to Travnicki. Defendant vehemently denies volunteering and described the selection process: "they (the Germans) didn't ask; if you didn't go they'd shoot you down like a dog."

The court specifically finds that the defendant did not volunteer for transfer to Travnicki.

At Travnicki most of the guards were Volksdeutschers (ethnic Germans who resided outside Germany in the areas occupied by the German Army). Defendant is not a Volksdeutscher but Ukrainian. He was doing carpentry work at Travnicki and testified he had to work or he might be executed. He received several beatings from

10. The only evidence as to defendant's activities before Treblinka was given by defendant plus some opinions voiced by Government's expert Jenkins.

11. The court can take judicial notice from numerous news stories published during the trial that many spectators at the trial had been in various concentration camps or death camps in Europe or had lost relatives there, or both. Defendant's testimony on direct began shortly after lunch. During the lunch recess a memorial service for the dead at Treblinka was held in the park-like area immediately outside of the courtroom. (The United States courtroom in Fort Lauderdale is in temporary quarters and the splendid new facilities for the Fort Lauderdale court and Federal Building will not open until about three months hence). Judging from the spectators' reactions to the colloquy over translating problems at the beginning of defendant's testimony, the spectators were hardly receptive to defendant; but that was to be expected as he had been described over the period of two weeks by various witnesses as committing gross atrocities.

Defendant described his early personal life; when he revealed his loss at the age of eight of his father in World War I and that his father was killed "by the Germans, of course", the courtroom became immediately quiet as if an engineer in the sound control booth had turned the gain control knob down to zero. When defendant testified about surviving by eating roots and grass, the courtroom became more quiet although that didn't seem possible.

the guards. Just as defendant was a hard-worker in America, he clearly did not shirk work responsibility at Travnicki—undoubtedly why the Germans selected him. He indicated that sometimes a loaf of bread was given for working.

In the spring of 1942 the Germans gave black uniforms to all of the prisoners. Volksdeutschers also wore black uniforms but theirs were well-tailored and of better material. After the barracks had been constructed at Travnicki the Germans gave instruction in the firing of rifles, such as field-stripping and in marching. They were not allowed to fire a rifle or to keep one. They also received some privileges such as being able to walk down the road outside of the camp. Defendant testified that he went to a Polish home where he gave them soap and they fed him. He added that if a prisoner did not come back he would be executed (when located).

In the spring of 1942 defendant was sent to Lublin where at first the prisoners guarded their own camp and then were sent to the Jewish ghetto; again the Germans did not ask for volunteers but demanded them to go. At Lublin the Soviet prisoners guarded houses, furniture—whatever was left; they were issued rifles which were not fired. The Soviet prisoners were converted from workers to guards at Lublin.

From Lublin defendant was sent to Warsaw along with about 80 to 100 others and the Soviet prisoners were asked if they wanted to go but none volunteered: there was "no choice." They were transported with a few Germans and two or three zugwachmaenner (spelled Zugwachmänner in German).

Defendant was transported to Treblinka as a prisoner-guard in approximately September 1942.

## TREBLINKA

The Government called six survivors at Treblinka, four of whom served as working prisoners at Camp 1 and two in what was described as Camp 2 (where the gas chambers were located.)[12] Each of the Govern-

12. Inasmuch as the actual operation of Treblinka is not an issue, it will be described in footnote form to assist in evaluating evidence of what defendant actually did there. Because of the nature of the Government's charge and also the nature of Fedorenko's defense, evidence was presented in clinical and gruesome details about the operation of the death camp known as Treblinka. The testimony was so gruesome that on more than one occasion the court doubted it would be possible to continue taking evidence until the usual recess time. Early recesses were required for the witnesses on several occasions.

Treblinka was a human abattoir. It contained only living facilities for the SS and the persons working there. The thousands who arrived daily on the trains had no need for barracks or mess halls: they would be dead before nightfall. It was operated with a barbarous methodology—brutally efficient—and such camps surely fill one of the darkest chapters in the annals of human existence, certainly the darkest in that which we call Western civilization. The camp at Treblinka was described repeatedly by witnesses with details to shock any listener. The camp was garrisoned by approximately 30 members of the SS and 150 Soviet, mostly Ukrainian, guards. Also in the camp were approximately 700 Jewish prisoners, mostly men, who performed various tasks.

The Government witnesses were among the working prisoners who escaped during an up-rising on August 2, 1943. Each had been there from eight to ten months as a laborer.

The general methodology emerges from the evidence: the Jewish victims were either rounded up from ghettos in Poland by the SS and Russian, Ukrainian or Latvian guards or were lured into a square by handbills promising each person three kilos of bread and a quantity of jam. One witness, Josef Czarny, then 15, came to the square in response to the notice after his parents and three sisters had starved to death in the Warsaw ghetto. After sometimes being held for as long as three days, they were then herded, with beatings, into cattle cars on a train. The train trip took occasionally three days, although Treblinka was located only about 100 kilometers east of Warsaw. No food or water was permitted the prisoners on the train and some slaked their thirst with perspiration and urine. Several persons perished during the trip and approximately 100 persons would be in the cattle cars or box cars.

Sometimes four or five trains (transports) would arrive at Treblinka during a day but occasionally there would be none. Each transport would contain 2,000 to 3,000 prisoners. The prisoners, unless selected as a labor prisoner, would be exterminated that same day either in a lazaret or the gas chambers.

Apparently to maintain order the prisoners aboard the train were told they were going to a labor camp although at least one witness testi-

ment witnesses testified as to general or specific instances of murder or brutality on the part of defendant.

Defendant admits he was a guard at Treblinka; however, he claims that he was a guard involuntarily and denied emphatically that he committed any atrocities or any of the specific acts of brutality described by the witnesses.

It is important to bear in mind that no documentary evidence whatsoever was introduced by the Government or defendant as to the duties or conduct of defendant at Treblinka. Therefore the issue turns entirely on the testimony and credibility of the witnesses.

The first witness, Eugen Turowski, testified that he had seen defendant at the lazaret many times shooting prisoners. He testified that defendant carried a leather whip with metal balls on it and frequently saw him beating arriving prisoners. He also claimed defendant shot prisoners who, after escaping and then being recaptured, were hung upside down as an example to the other prisoners. Turowski described defendant in 1942 as having specific eyes that were "slightly Chinese looking" and that defendant was a non-commissioned officer who spoke "bad German" and was called by name by the SS personnel. Turowski claimed there were no Volksdeutschers at Treblinka but that Biedermann was the leader of the "Ukrainian" guards and that Rohoza was not a leader of an Ukrainian unit.

The second witness, Schalom Kohn, testified that defendant beat him with his whip on two occasions and he saw defendant beat other Jewish prisoners at the arrival of the

fied of knowing what Treblinka was. He also testified he could smell the burning flesh upon arriving there. However, various ruses confronted the prisoners as they were ordered from the trains onto the ramp between two rows of SS troops and Soviet guards urging them to run faster and beating them with whips and rifle butts. The ruses included a sign over the camp entrance in German bearing a motto that "work makes life sweeter" and an orchestra playing at the entrance. The orchestra was conducted by Herbert Gold (a noted conductor from Warsaw, per *Fort Lauderdale News* article dated June 3rd, 1978). Mr. Gold and the members of the orchestra were, of course, working prisoners. A well was nearby but it was dry.

In view of the relatively small number of SS and Soviet guards, even though well armed, compared to the large number of labor prisoners and arriving prisoners, the system of ruses, beatings, and humiliation apparently was to assist the SS in maintaining order by keeping the arriving prisoners confused and bewildered and thereby docile. In addition, it also prevented organization among the prisoners which might have resulted in a charge en masse by the prisoners. Only the prisoners arriving after the ghetto uprising in Warsaw in the spring of 1943, for example, refused to doff their clothing upon their arrival.

A grisly establishment was camouflaged and identified as a lazaret, meaning first aid station. The working prisoners were also at the entrance of the lazaret bearing Red Cross armbands and a Red Cross flag flew over the entrance. Another cruel ruse: it was a charnel house.

The purpose of the lazaret was to receive and liquidate the aged, the crippled and children without parents. These persons were separated from the rest of the arriving prisoners and taken to the lazaret which had a bench on the bank of a pit three meters deep and approximately 20 meters long and 10 meters across. After being stripped the prisoners were seated on the bench and were executed by being shot in the back of the head; their bodies would fall into the pit. A fire was kept constantly burning in the pit to dispose of the corpses.

The other arriving prisoners were separated into groups of men and women; the men were ordered to remove all their clothing in the open "square". The clothing was processed by the working prisoners and the camp was described as having "mountains of shoes" and "mountains of eye glasses".

The female prisoners were herded into a barracks where they were ordered to disrobe; they then filed into a barber shop set up at the end of the barracks where 20 men served as barbers. Each barber had about one minute to cut as much hair as possible from the head of each woman. Apparently the hair was used for various products as well as being steam cleaned in an effort to find if any valuables were hidden there. From the barber shop the women were herded out onto the path and both men and women made to run to Camp 2 where the gas chambers were located, referred to as "baths". As final sardonic actions, the path to Camp 2 was termed by the SS "Himmelweg"—the road to heaven. And on the gas chambers in Camp 2 was painted the Star of David.

Treblinka—bleaker than Bruegel's *Triumph of Death*. The death toll? One million victims, according to one witness.

transport. He also testified he saw defendant beating prisoners at the lazaret.

Kohn described defendant as "mean-looking", and when he walked around the courtroom there was the same "mean-looking" face; that was his explanation for being able to identify defendant in the courtroom.

Josef Czarny, clearly the least credible of the survivor witnesses, testified that at the arrival of every transport he saw defendant beating people as they emerged from the cars, and that he saw defendant on one occasion shoot a prisoner at the lazaret. Czarny claimed to have seen defendant at every one of the twice-daily assemblies, and that there were no other Ukrainians at the daily assemblies.

Mr. Gustaw Boraks was the last of the survivor witnesses who worked in Camp 1, the receiving area where the lazaret was located. He was the most candid and credible of the survivor witnesses. Boraks testified he would go to the arrival of the transport two or three times a week to look for friends or relatives and saw defendant there although he had only a few minutes to stay in that area. He never saw defendant hitting prisoners or had any personal confrontations with him.

From his position in the barber shop nearest the door at the end of the barracks where the women had to undress, he heard a shot one day. Boraks rushed to the door and saw defendant, the SS and other Soviet guards and a woman who had been shot in the shoulder. He did not see Fedorenko shoot her but testified that defendant had a revolver in his hand and was closer to the woman than anyone else. He subsequently cut the woman's hair before she was sent to the gas chamber; she told Boraks that she had been shot because she did not want to undress. He didn't know who shot the woman and the woman said she didn't know who it was either. He further testified that defendant did nothing wrong in the barracks with the women who were undressing. He testified he had seen defendant chasing people on the pathway to Camp 2 a few times and he knew it was defendant because he wore a black uniform while the others wore khaki. He testified that Fedorenko was some type of leader of the Ukrainian guards.

Two witnesses testified about working in Camp 2, where the gas chambers were located. The first, Sonja Lewkowicz, testified that defendant had a long and terrifying face and that she saw him in Camp 2 many times. She testified that on one occasion she saw him from a distance of 20 meters shoot a Jewish prisoner in Camp 2, but when she realized what was happening quickly turned her head. She never remembers defendant being at the twice-daily assemblies and never remembers seeing him beat or mistreat any prisoners other than the shooting incident.

The last of the survivor witnesses, Pinchas Epstein, was a witness with considerable intensity showing on his face; he testified he saw defendant beat Jewish prisoners and that on one occasion defendant shot and killed a friend of his named Laibel from his home town. On direct examination he described the incident as having occurred when Laibel's partner was returning alone from dumping a corpse into one of the pits in Camp 2.

On cross-examination Epstein stated he was Laibel's stretcher-bearer partner on the day Laibel was shot. That answer was completely inconsistent with his testimony on direct; upon his realization of that he began to squirm and fidget in the witness stand. In addition, Epstein did not mention to investigator Martin Kolar the matter of the shooting of his hometown friend or of any of the beating incidents attributed by him to defendant despite a three hour conversation with Kolar. Epstein acknowledged that Kolar told him at the interview that the purpose of the interview was for testimony against Fedorenko.

Defendant's testimony was basically a denial of all charges. He contended he was a wachmann—a sentry or guard—not a noncommissioned officer. He testified that he was never in the barracks with the women undressed; he was only at the arrival of the transport on one or two occasions and did not know what was going on at the camp.

At least the latter is not credible to this court, neither in content nor from the manner in which the testimony was given. Defendant was far from convincing in his manner of speaking and appearance when he testified about unawareness of what was going on at Treblinka. (That testimony was in distinct contrast to his usual earnest testimony where he often volunteered extra items in his answers.) He testified he patrolled the fence as a guard and served in the tower. He testified he only served as a sentry outside of Camp 2 one day and saw what was going on, and reported to his zugwachmann—whom he identified as Rohoza—that he couldn't eat or sleep and didn't want to go back to that post again. He denied participating at all in Camp 2 or ever being near the gas chambers.

The phrase most constantly used throughout the trial was zugwachmann. The survivors were all convinced and all testified that zugwachmaenner were leaders among the Ukrainian or Soviet guards and that defendant was one.[13] The word does not translate easily and despite the request of the court for any source of material providing a translation, none was offered. The survivor witnesses claimed that defendant was a zugwachmann because he had one or two stripes on his shoulder. Defendant explained the stripes away as being good conduct awards because he didn't walk around dirty or get drunk.

The Government offered no expert testimony on the rank-structure and testimony of their expert witness, Mr. Kempton Jenkins, didn't quite touch on the subject. His testimony about the camps was consistently inaccurate.[14]

Defendant's description of who was a zugwachmann at least fits a logical pattern. He characterized zugwachmaenner as being Volksdeutschers because the Volksdeutschers', who were of ethnic German background, ability to speak both German and Russian or Ukrainian enabled the SS to use the Volksdeutschers as zugwachmaenner to transmit orders. From the evidence the chain of command in a descending order went as follows: SS (Schutzstaffeln); Volksdeutschers as zugwachmaenner; Soviet, basically Ukrainian, guards; working prisoners with a Nazi-imposed hierarchy of a head kapo, kapos, vorarbeiters (foremen), and regular working prisoners. There is nothing in the evidence to suggest that Fedorenko is a Volksdeutscher [15] and there is nothing in the record from his background or education to raise the slightest suspicion that he could have learned more than a few words of German.

Fedorenko's testimony that only Volksdeutschers qualified as zugwachmaenner is

---

13. Apparently, Zugwachmann is the leader of a group of guards or sentries and the group is the size of a squad (could be as large as one-third of a company). See Heath's *German* Dictionary.

Although the parties and the court treated the word as being "Zugwachmann," the court now has some suspicion that the spelling should have been "Zuchtwachmann." Zucht is the secondary word for prison, Cassell's German Dictionary 1303 (1978 ed.), and Zuchtwachmann would mean prison guard or prison sentry. However, even if the latter was *the correct spelling of the word in question, it* would not change any finding or conclusions of the court.

14. For example, see text at pages 912–913.

15. The court considered the possibility that defendant's mother was an ethnic German. The first (Christian) name, Anna, is not an infrequent one both among German and Russian names. Defendant consistently listed his mother's maiden name as Hubar. The court's very limited familiarity with the German language doesn't cause any suspicion that the surname, Hubar, is a German name. However, on defendant's application for citizenship her name is spelled H-u-b-e-r; that spelling is in red ink and those notations were added by the Immigration and Naturalization Inspector Zimon. Notice can be taken of library resources which indicate that the name is a Ukrainian rather than German name; for example, O. Hubar has been cataloged by the Library of Congress as the author of a work on Ukrainian literature.

Even if defendant's mother were an ethnic German, there is nothing to indicate that his father was an ethnic German. It seems highly doubtful—and speculative at most—to assume the German language was spoken in the Fedorenko home, at least before the father's death. Far more importantly, the evidence overwhelmingly rebuts any such speculation.

supported by the berthing and messing arrangements at Treblinka. The SS didn't let the Volksdeutschers sleep or eat in the same barracks with them. Instead, the Volksdeutschers were permitted to sleep in a separate barracks—apparently giving them some privileges because of their German background—but were required to eat with the Soviet prisoner-guards, facilitating supervision of the guards by the zugwachmaenner.

The court specifically finds defendant was not a Volksdeutscher and not a zugwachmann.

## PHOTO SPREADS

In view of defendant's assertion that he was only a perimeter guard who didn't commit any atrocities at Treblinka, the issue of identification is the heart of this case. The witnesses' identifications of defendant as the perpetrator of the crimes described were based on recognition of his photo and his person in the courtroom. In view of the passage of 35 years from the date of the incidents, the court must scrutinize these identifications and the circumstances under which they were made with great care.

The subject of pretrial and in-court identification and their reliability have received thorough attention by the courts in criminal cases. This attention has been focused on the dangers that pretrial identification may taint or make unreliable subsequent in-court identification. Thus to preserve the integrity and fairness of pretrial identification procedures, courts have imposed on their use certain requirements of due process. *See, e. g., Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stoval v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

Although the instant case is a civil case, the concerns of the Supreme Court regarding the reliability and probative value of identifications made in criminal cases are no less applicable here. Thus the court turns to those cases to determine what weight to give the testimony in this case in view of the circumstances surrounding the witnesses' identifications.

The problems inherent in the use of photo spreads as a pretrial identification procedure were pointed out in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In the usual case, where a witness has not had an opportunity to get a good look at a criminal under favorable conditions, there is a danger of misidentification of a photograph, even under the best of circumstances. This danger is greatly increased when the photograph is placed in a photo spread in such a manner that the witnesses' attention is drawn to it because of its size, color, placement or other distinguishing mark. Thus while the Court recognized that use of photo spreads was necessary in police work, it held that a conviction based on an in-court identification following a pretrial identification would not stand if the photo spread was so unduly suggestive as to foster "a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971. Cases following *Simmons* have therefore followed a two-step formula in determining the admissibility of an in-court identification based on an out-of-court photo spread: " . . . (1) whether the procedures followed were 'impermissibly suggestive', and then (2) whether, being so, they created 'a substantial risk of misidentification' ". *United States v. Henderson,* 489 F.2d 802 (5th Cir. 1973).

With a time interval of 35 years, rather than days or a few weeks as in the typical criminal case, the threshold of what suggestibility becomes impermissible must necessarily be lowered. The court cannot find a decision considering the question with a time lag of many years' duration. The Supreme Court did observe in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) that a lapse of seven months between the event and the confrontation " . . . would be a seriously negative factor in most cases." *Id.* at 201, 93 S.Ct. at 383. In the instant case where there is a gap of almost 35 years between the event and the witnesses' ability to observe the

suggestive photo spreads, the photo spread should have been as clinically impartial as humanly possible to construct.

Prior to giving testimony in this trial, each survivor-witness was interviewed in Israel by the Israeli police concerning events at Treblinka. Each was shown a group of photographs and asked if they recognized anyone.

The photo spread (Government's Exhibit 17) was prepared by Maria Radwiker, an Israeli attorney who worked as an inspector investigating Nazi crimes from January 1965 until her recent retirement in January of this year. She showed only the first three pages of the photo spread to witnesses Turowski and Czarny and all six pages to Kohn. Mr. Boraks was shown only page 3 of the exhibit, Ms. Radwiker's successor, Martin Kolar, showed witness Lewkowicz pages 2 and 3 of the exhibit and only page 3 after a three hour interview to witness Epstein.

Only two of the photographs of the photo spread are claimed by Ms. Radwiker to be guards who were at Treblinka—# 16 and # 17. Page 3, which was shown by itself to several of the witnesses, contains 8 photographs, numbers 10 thru 17. Not only is each of the first six smaller than either # 16 or # 17 but each is also blurred, shadowed or otherwise indistinct. By contrast, photographs # 16 and # 17 are both much larger than the other photographs and are the only clear ones. Not only is defendant's photograph larger than the others but it is also unnecessarily so: along each side is a superfluous black border approximately one-half inch in width. At the very minimum, it should have been trimmed to reduce the size of the picture.

A review of the first two pages reveals more blurred or otherwise indistinct photographs. The only one with any clarity is # 9, and it is smaller and less clear than either # 16 or # 17.

All six of these witnesses escaped from Treblinka during the uprising on August 2, 1943. Several of the witnesses had trouble identifying defendant's photograph in the sense that it took one to five minutes to do so. For example, Boraks took one to two minutes to identify photograph # 17 although he had looked at the same photo spread in an interview earlier that same day where the investigators were investigating # 16; witness Epstein looked at the picture four to five minutes after a three-hour interview and identified the person as a zugwachmann but couldn't remember his name. Turowski testified that he immediately recognized the person in picture # 16 (not Fedorenko). Ms. Radwiker indicated to him that # 17 was Fedorenko and asked if he recognized Fedorenko; Turowski testified that after awhile he came to the conclusion he recognized him.

The Government only asked the first three of the witnesses to identify defendant in the courtroom, a subject which will be discussed in detail subsequently.

Kolar testified that in Israel the showing of three photographs is sufficient and Ms. Radwiker defended her manner of presentation of the photo spread as "my method."

Considering all circumstances surrounding the photo identifications, it seems clear that the makeup of the photo spread in this case is impermissibly suggestive. There was no reason at all for the Israeli investigators to set up the photo spread in the suggestive manner in which it was done. Perhaps the explanation given by Mr. Kolar that only three photographs are required in Israel provides the answer to why it was done in this fashion. However, the photo spread simply does not pass muster under American law.

 The court must conclude not only was the photo spread impermissibly suggestive but it also led to a substantial act of misidentification for the three witnesses who attempted courtroom identification. It also tainted testimonial identification of defendant, critical because of the serious question whether the survivor-witnesses were describing defendant or another Russian at Treblinka.

## COURTROOM IDENTIFICATION OF DEFENDANT

Turowski, the first-survivor witness, was asked to identify defendant in the court-

room on direct examination. He stood up in the witness stand and looked around the courtroom for forty seconds. Then Government counsel asked if the witness could come down from the witness stand to make an identification, if possible. The witness stepped down from the stand and took only one minute to make an identification of a middle-aged spectator sitting in the last row of the courtroom.[16] Apparently sensing from the crowd reaction he had blundered, the witness backed away from the gentleman he had identified, then moved around the courtroom and in exactly another minute identified defendant.

The courtroom is square, approximately 40 feet to a side. Defendant sat approximately 22 feet from the witness stand, with his lawyer and associate, ages 30 and 26 respectively and translator, under 30. At the Government's counsel table sat four lawyers, whose ages ranged from 31 to 36.

The second witness Kohn never once looked at the spectators' section when asked to identify defendant in the courtroom. At this point the court became quite suspicious that Federal Evidence Rule 615 excluding witnesses, invoked by defendant at the beginning of the trial, was being violated. The court had given the instruction that witnesses were not to discuss the case among themselves. Kohn scanned only the counsel tables and easily identified defendant—not exactly a difficult task in view of defendant's age being twice that of any of the other seven persons at the counsel tables.

Czarny's performance at the witness stand was almost a carbon copy of witness Kohn in the identification of defendant, with the exception that Czarny was more theatrical.

Mr. Boraks was not asked to identify defendant and responded to questions by talking directly to his translator. His translator was located on the side opposite from defendant's location. Exactly eighteen minutes after he took the witness stand Boraks quickly turned more than 90 degrees to look directly at the position where defendant was sitting and without ever scanning the courtroom he quickly looked back to the interpreter.

The court was convinced the witnesses were discussing the trial among themselves, at least; and at worst someone was coaching them. Defense counsel had made the motion to sequester witnesses at the beginning of the trial but had not objected to Ms. Radwiker remaining in the courtroom and sitting directly behind Government's counsel table after she had finished her testimony. Defense counsel now insisted the rule be enforced and that she be excluded from the courtroom; the court enforced the motion and excluded Ms. Radwiker from the courtroom for the remainder of the trial.

The in-court identification of defendant by the three witnesses would have been rather weak under any circumstances because of the obvious location of defendant (obvious except to Mr. Turowski) and the great difference between his age and that of the other seven persons at counsel tables plus defendant was the only one with a translator. However, because of the obvious discussion of the case by the witnesses in violation of the rule, the court rejects the in-court identification *in toto.*

## IDENTIFICATION OF DEFENDANT

In addition to the grave identification deficiencies of the Government's case, there are many other grave flaws in the identification testimony of the Government's witnesses as well as the credibility problems. Perhaps it is understandable that there are flaws in identification evidence after 35 years. That is part of the difficulty the Government faced in trying to meet its burden of proof. Among the more obvious

---

**16.** Turowski and each of the six survivors at Treblinka also testified at a trial in Dusseldorf in 1965 against 11 SS personnel. Most also testified in Dusseldorf in 1970 against Stangl, the Commandant at Treblinka. The court noted that, according to the news article carried in the Miami Herald, May 31, 1978, describing Turowski's error, at the Dusseldorf proceedings the German court would locate defendants among the spectators in order to test the identification ability of the witnesses.

identification flaws: Turowski described defendant as "slightly Chinese-looking". However, defendant Fedorenko simply does not look Oriental. He doesn't now and he didn't in the picture attached to his visa application.

Kohn described defendant as "mean-looking", and when he walked around the courtroom there was the same "mean-looking" face. That was his explanation for being able to identify defendant in the courtroom.

Czarny testified that he could identify Fedorenko when he walked around the courtroom because there was the "same mean-looking face". After the two days of testimony in Connecticut before beginning the Fort Lauderdale portion of the trial, and also at the close of all the testimony, the court concluded that defendant had a kind-looking, not hard-looking face, somewhat courtly in appearance. In no way can this court conclude he has a mean-looking face at this time.

Czarny also emphatically identified defendant's exhibit # 3 as Fedorenko and announced he could never make a mistake. Of course the photograph was not of Fedorenko.[17] Boraks identified Fedorenko as being the only Soviet guard who wore black, completely contrary to the testimony of all the other witnesses about the uniforms worn by the Soviet guards. Witness Lewkowicz quickly looked away after the only incident when she described the atrocity allegedly committed by Fedorenko.

Epstein talked for over three hours in the interview with Israeli investigator Kolar but never mentioned anything about Fedorenko. He had trouble in identifying Fedorenko even from the suggestive photo spread. In addition to the inability to remember the alleged shooting of his home-

town friend, whom he claimed was his stretcher-bearer partner, he was squirming when he realized he had blundered into an indefensibly· inconsistent description of the event. His testimony against Fedorenko simply lacks credibility.

Fedorenko's cross-examination perhaps supplied the missing piece in the puzzle when the Government's counsel persisted in asking defendant to describe his zugwachmann Rohoza. Fedorenko testified that Rohoza was "just like me" in height and his hair color was "just like mine." The persistent questioning about Rohoza's appearance elicited this response: " . . . like my face, almost like my brother." And to a further question, that the resemblance between the two was such they looked like brothers. The court watched Fedorenko even more closely than usual when that line of questioning began and the court is firmly convinced that the answers were given guilelessly. From observation of his testimony and demeanor the court concludes defendant is unsophisticated—and perhaps feeling some effects of being in his eighth decade (e. g., see p. 1419 of transcript). The court doubts defendant is aware at this time of the exculpatory nature of the answers.

At the close of cross-examination the court asked questions of defendant for 50 minutes. Although defendant denied committing the atrocities during direct-examination, the court wanted the key answer from defendant face-to-face without the necessity of any translation. Confident that its location in the questioning would not favor or disfavor defendant and confident that defendant understood the question completely, the court instructed the translator to ask the question whether defendant had done any of the shooting and beating of

---

**17.** Czarny exhibited a number of other credibility flaws. He would become more theatrical when he was aware the court was watching him closely. His facial expressions became more dramatic especially during his courtroom identification of defendant and his testimony after lunch on re-direct about his previous misidentification of exhibit # 3 as being Fedorenko. Further, the witness clearly understood a number of questions in English but specifically denied any knowledge of understanding the English language, even to the court. This despite answering questions on more than one occasion without the benefit of a translator. One of those questions contained more than ten words. Witness Epstein also obviously understood English but denied it (also to the court) although his knowledge may not have been as extensive as Czarny's.

prisoners as testified to in the courtroom and instructed defendant to "Please look at me, tell me either nyet or da, did you?"

From about 10 feet away with unobstructed eye contact defendant's answer was sincere and strong: Nyet.

The court considered the answer credible.

■ Even without defendant's testimony, the Government's evidence on the claimed commission of atrocities by Fedorenko fell short of meeting the "clear, convincing and unequivocal" burden of proof. In fact, the court should have granted a motion for involuntary dismissal on those particular counts at the close of the Government's case. With defendant's testimony the Government's evidence fell woefully short of meeting the burden. The evidence left the court with suspicions about whether defendant participated in atrocities at Treblinka but they were only suspicions.

### EXONERATION TESTIMONY BY RUSSIAN WITNESSES

At the beginning of the Fort Lauderdale proceedings, defendant filed a motion for continuance claiming that there were six witnesses in Russia who could give exculpatory testimony. Defense counsel asserted that defendant had just brought these matters to counsel's attention because of his difficulty in communicating with defendant about the nature of the charges.

Defendant has been back to the Soviet Union three times in the 1970's: once in 1972 "as a tourist"; again in 1973 for approximately three months and in 1975 for a period of 50 weeks. In late September or early October of 1973, several weeks before his departure from the Soviet Union in November, defendant asserts the Soviet Union investigated him at some length concerning his status in World War II and activities at Treblinka. A Russian Colonel asked questions of him on three different days, for a period of six hours on one occasion. The only other witness he saw was a witness named Kuzmienko who was only interrogated for five or ten minutes. He said the Russians came for him in a car and took him to the city of Siemferopol in the Crimea. He claimed that the Russian investigation cleared him of any wrongdoing and that they had taken statements of the six persons, Nikolai Korotkey, Wasyl Wasylenko, Michael Dudnik, Petro Schelno, Ivan Schevchenko and Nikolai Rohoza, whose testimony he wanted to obtain for this trial. Defendant sought a continuance in order to obtain the testimony or evidence of these six persons, five of them guards at Treblinka as well as Rohoza, defendant's zugwachmann. The court urged both sides to begin immediately to obtain more information about the potential witnesses and the procedures available and necessary to obtain the evidence from them.[18]

18. The court suggested that the most preferable means would be by an evidentiary hearing with the court sitting as a special master although that apparently is precluded at this point by the resolution of the Judicial Conference. Of course, this cannot be done without the approval of the Soviet Government; however, the Soviet Government has given permission for a West German court to conduct hearings in the Soviet Union of Soviet witnesses in connection with a West German trial of various defendants for alleged atrocities at Majdanek, Poland. See *Miami Herald*, May 28, 1978.

In view of the court's prior order virtually demanding the use of live witnesses from Israel rather than deposition testimony, the court felt it would be unfair to defendant if the obtaining of such testimony for defendant were to be limited to depositions or written interrogatories in presenting his corroborating testimony.

Next to an evidentiary hearing, the next most helpful means of presenting the evidence would be by video deposition but that possibility seems remote at best. Under the circumstances depositions by oral examination would have been the best feasible method and the least helpful would be depositions upon written interrogatories under letters rogatory. However, written interrogatories apparently are the only likely method of obtaining testimony from witnesses of the Soviet Union, per advice of the Administrative Office of the United States Courts which was communicated to counsel. Of course, no fellow Russian or Ukrainian who was at Treblinka and now in the United States is about to come forward to testify. This is particularly true because the instant case reputedly is the first of many against East European prisoner-guards now in the United States. See, e. g., *Miami Herald* article, p. 1, dated July 20, 1978.

At a post-recess hearing one evening after two weeks of trial and the Government not having rested its case, the court commented during colloquy on scheduling and the motion for continuance that it felt it was necessary in the interests of fair trial to give defendant an opportunity to present the testimony of these witnesses to corroborate his denial or claim of involuntariness. The court emphasized that it might be able to decide the case without the continuance but also recognized that, because of the uncertainty about obtaining testimony from the Russian witnesses, it might take years to obtain the testimony and decide the case.[19]

If the Soviet Government conducted an inquiry in 1973 and cleared defendant of any complicity in war crimes at Treblinka or of collaborating with the Nazis, such a proceeding would be interesting to muse about but it would not be admissible *per se* in an American court. The fact such an inquiry was held is indeed curious, particularly because defendant testified that amnesty was given by the Soviet Union in 1955. Edict on Amnesty for the Soviet Citizens Who Collaborated with the Occupying Powers During the Great Patriotic War 1941–1945, *Vedomosti Verkhovnogo Soveta SSSR* [official law gazette of the USSR] No. 17, at 345 (1955). Defendant volunteered this information. The court has concluded that it is not necessary to obtain the testimony of the Russian witnesses in order to decide the case.

## POST–TREBLINKA

Following the uprising at Treblinka, Fedorenko and other Soviet prisoner-guards were transported by the SS back to Travnicki in different groups. One of the groups killed a German officer and fled after no other prisoner-guards would join them.

After a few days in Travnicki defendant was transported to Danzig with about 80 or so other prisoners, including Russians, Ukrainians, Byelo-Russians and Poles. Defendant served there as a guard for approximately eight months; the camp at Danzig was not a death camp. Defendant was then transferred to Poelitz, a prisoner-of-war camp where many prisoners died from starvation. At Poelitz he was used as a guard but never left the camp; defendant claimed the Germans didn't trust him and the others who were transferred to Poelitz, probably because the Russian army was getting closer. After five or six months at Poelitz defendant was transferred to Hamburg where he was assigned to guard produce and warehouses. After a short period of time the British occupied Hamburg; defendant worked for the British from 1945 to 1949.

In Hamburg defendant had a work uniform and an after-hours uniform. He described better conditions under the British: he received good food and 100 marks per month.

In 1945 the prisoners of the British were required to register and defendant listed his birthplace as Sarny, Poland because every

---

**19.** The court felt an announcement had to be made to counsel in order to obtain maximum haste on their part in getting the testimony or whatever evidence could be obtained from the Russian witnesses.

The spectators had left the courtroom by the time of the hearing, and that seemed an appropriate time for the court to make its comment. The court was aware that the Jewish Defense League members were in attendance in the courtroom as spectators; the court was also aware that, when an Administrative Law Judge announced a continuance to permit the Government to obtain more evidence in a deportation hearing in Baltimore of an alleged ghetto guard in Latvia, the Jewish Defense League had staged what can be described as a

riot in the courtroom. See news article, p. 6E, *Fort Lauderdale News* dated Dec. 4, 1977. The court was well aware of the emotional nature of the issues in this case and wished to assure the citizens in South Florida that any such continuances would not be one of indefinite duration even though it might take many months and perhaps well over a year. The court attempted to communicate that matter but the attempt was either misconstrued or too little, too late. The misinterpretation of the length of a possible continuance apparently stimulated the Jewish Defense League into printing and handing out leaflets by the following afternoon demanding the disqualification and impeachment of the trial judge.

Russian citizen had to return to the Soviet Union. He selected the town of Sarny because some friends suggested it. Defendant used his correct name and birth date on the registration, visa applications and relevant documents for naturalization.

The testimony of a fellow-inmate of the camp in Hamburg indicates there were about 1,000 persons there; all were Polish except 200 to 300 Russians, mostly Ukrainian, and the camp was supervised by Polish officers. When Russian investigators came seeking Russians for repatriation, Polish officers protected the Ukrainians and Soviet residents by advising the Russians that all residents of the camp were Polish.

Defendant feared repatriation as did the other Soviet citizens at the camp. One witness testified that thousands committed suicide rather than be repatriated to the Soviet Union.[20]

While residing at the displaced persons camp at Osdorf near Hamburg, defendant applied for an immigration visa giving his correct name and date of birth, listing his place of birth as Sarny, Poland. In his history, considered by the Displaced Persons Commission, the same information was given together with some additional information: that he was a member of the Greek Orthodox faith and received his education at Sarny consisting of elementary school from 1915 to 1918. In addition he contended he was a farmer at Sarny until March 1942 when he was deported to Germany and employed as a worker at Poelitz.[21] A typist who evidently spoke English but not German mistakenly typed Pelez rather than

Poelitz in both places it appears on the Displaced Persons Commission report. Clearly a German location could not be spelled Pelez and the court must presume that the case analyst and reviewing persons on the Displaced Persons Commission and, more importantly, the reviewing Vice-Consul knew Poelitz was the location, particularly because it was identified as being "near Stettin." Jenkins testified vice-consuls received several months of German language training.

Defendant's application for a visa was executed before the Vice-Consul on October 12, 1949 at the Consular office at Wentorf near Hamburg. He was approved by the Vice-Consul for admission to the United States under the Displaced Persons Act and arrived in America on November 5th, 1949, and went to work on a farm in Litchfield, Connecticut. Unfortunately, and inexplicably, the Government did not find the Vice-Consul who approved defendant's application.

On November 21, 1950 defendant filed a Declaration of Intention listing his birthplace as Sivash in the Ukraine. The same information is provided in his Declaration of Intention filed April 7, 1951.

The Government called Kempton Jenkins, a career foreign service officer as an expert witness; he was formerly a Vice-Consul reviewing Displaced Persons cases in south Germany subsequent to the time defendant came to America. Although the witness was a very engaging person, the court found a number of inaccuracies in his testimony and must therefore consider his testimony in the light of all the evidence.

**20.** Defendant requested a continuance in the third week of trial in order to produce a witness who could testify that many Ukrainians committed suicide, including death by immolation, rather than suffer repatriation. The court rejected the motion for continuance on the basis the evidence would be merely cumulative.

**21.** Poelitz is spelled with an umlaut in German, viz., Pölitz. It is located slightly less than 10 miles (15 kilometers) north of the center of Stettin, per National Geographic Society map of Germany (1944). Inasmuch as Poelitz and Stettin have been situated in Poland since World War II, it is difficult to locate Poelitz by the German spelling in most atlases. However,

see p. 50 of Rand McNally's International Atlas (1969) which lists both German and Polish spellings. The name is spelled incorrectly in the transcript.

The court located a village named Pehlitz in East Germany. It is apparently too small to be listed even in detailed atlases. Its coordinates place it twenty miles closer to the outskirts of Berlin than to the outskirts of Stettin. From the evidence (e. g. "near Stettin"; "in the suburbs, approximately fifteen kilometers from the city" p. 1361.) the court concludes Poelitz is the location referred to in the Displaced Persons Commission report.

Any Vice-Consul had a number of materials presented to him by an applicant for a visa. At that point the applicant had been interviewed by a voluntary sponsoring group (in defendant's case the Tolstoy Foundation) and by the Displaced Persons Commission. The Vice-Consul had a report from the Displaced Persons Commission as well as one from the Army CIC (Counter-Intelligence Corps) which checked any service record with the Axis forces. In addition, a report on conduct from the local German police was furnished together with any report from the Berlin Depository Center which contained a depository of Nazi party documents.

If a prisoner indicated he was with a labor force a check was made of the records as to that labor force. In the instant case, defendant did advise them he had been at Poelitz.

Jenkins testified that the persons to be excluded under the Displaced Persons Act were ones who participated in or acquiesced in crimes against humanity or against civilians or served voluntarily with Axis military forces. He stressed that the benefit of the doubt was to be given to the applicant and the objective was to make a humanitarian solution. He testified that many applicants were members of the East European Waffen SS (combat) divisions who claimed to be serving involuntarily. The Vice-Consul would have to decide whether to admit the applicant and testified the tendency would be to make a favorable judgment and admit the applicant. He testified that the Displaced Persons Commission and Vice-Consuls recognized that many East Europeans hated the Russians as much as they did the Germans. He also added the fact the Russians might execute the applicant was a reality that was considered. He acknowledged that some visas were granted to members of General Vlasov's army (The "Army of the Damned"), although that Army fought side-by-side with the Germans against the Russians and comprised Soviet volunteers.

Jenkins testified he knew of no camp guards whose applications were favorably processed but he admitted he only remembered three and his experience was with Dachau which was located in Southern Germany. He assumed the camps east of Germany, such as Treblinka and Sobibor, located to the east of Warsaw, would be more brutal because the German civilian population was less likely to learn of it. He also testified that thousands of Germans who were not Jewish were killed in concentration camps. The survivors' testimony about Treblinka indicates that only Jewish persons were exterminated there plus a few gypsies.

Jenkins' testimony about the structure of the death camp organization was hardly expert and conflicts consistently with other evidence presented at the trial. For example, he testified that the Ukrainian guards had the same uniforms as the SS with only slightly different insignia. However, the unanimous testimony was the Germans wore their usual gray-green uniforms but the prisoner-guards didn't. He testified that the camp guards could get leave and get away from the camp and could transfer. The testimony was clear that they could not take leave (and go to Berlin, as Jenkins opined) but could only get a two-to-four-hour pass to visit a small village a couple of miles away.

The testimony of defendant refutes the assumption that the camp guards could transfer to other duty. Jenkins also testified that the Germans commandeered all the best houses and the camp guards had excellent living conditions, had movies and were well-fed. There was no evidence about the quality of the meals or about movies in the camp but Soviet prisoner-guards lived in barracks rather than in "the best houses".

Jenkins also would have considered the kapos as excludable because they assisted the Germans. This is totally contrary to the reaction of every witness who survived Treblinka; each of the Israeli witnesses testified the kapos did only what they had to do and the witnesses were quite indignant when asked if they had ever testified against the kapos. The witnesses replied

that there was no reason to do so. In addition, Jenkins speculated that the kapos were probably shot in 1945 during a period of retaliation, but the testimony was to the contrary.

The Constitution of The International Refugee Organization describes in part II of Annex I "Persons who will not be [considered as displaced persons]." Under the second listing are two classifications:

2. Any other persons who can be shown:
 (a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or
 (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations.

It has troubled the court that the word "voluntarily" appears in connection with service with the Axis military forces but is deleted from the phrase in section 2(a). The concern arises because the traditional principles of statutory construction would hold that the deletion of the word "voluntarily" in one subsection while its inclusion in another compels the conclusion that *any* assistance, whether voluntary or involuntary, in connection with concentration camp treatment of civilian population would be sufficient to bar that person from being entitled to relief under the Displaced Persons Act. The difficulty with that construction is that it would bar every Jewish prisoner who survived Treblinka because each one of them assisted the SS in the operation of the camp. Each did so involuntarily and under the utmost duress. For example, working prisoners led arriving prisoners to the lazaret to be executed; or wore armbands as part of the ruse at the lazaret; or cut the hair of the females to be executed; others played in the orchestra at the gate as part of that ruse, etc. Technically, this is assistance. It is also absurd to deem their conduct as "assistance or acquiescence" inasmuch as it was involuntary—even though the word "voluntarily" was omitted from the definition.

The Government listed witnesses who were Treblinka survivors and now reside in America, presumably as U. S. citizens. To interpret "assistance or acquiescence" without requiring it to be done "voluntarily" could imperil their status.

The Government's expert witness, Mr. Jenkins, opined that he would bar kapos from the benefits of the Displaced Persons Act because of their assistance to the SS in supervising the activities of the other Jewish prisoners. Unanimously the survivors of the Treblinka prison camp defended the actions of the kapos. They pointed that the kapos had administered beatings at the command of the SS with just enough strength to avoid getting themselves into trouble with the SS while not being severe enough to injure the prisoner. Here again, if the word "voluntarily" is not read into subsection 2(a) kapos also would be denied admission under the Displaced Persons Act.

To construe the definition in that fashion would be to thwart totally the most obviously deserving persons: the prisoners who survived death camps such as Treblinka.

## WAS FEDORENKO'S GUARD DUTY VOLUNTARY?

The court has previously found Fedorenko did not volunteer to go to Travnicki and did not volunteer to be a guard at Lublin or Treblinka. Nor did he volunteer for Warsaw, Danzig, Poelitz or Hamburg.

The question still remains whether Fedorenko could have made some feasible choice other than serving as a guard, particularly at Treblinka. The court has already found that defendant could not have transferred to another division.

Fedorenko had rights that the typical prisoner of war does not have, for example: carrying a rifle and a pistol, being able to go on liberty for four hours and even being given some small stipend from the Germans. On the other hand, he clearly did not have the right to walk out of the gate, go to a city of his choice, or catch a train to his home or wherever else he wanted to go. Although not a typical prisoner of war, he was clearly not one of the captors. He was in some limbo state of having privileges not

usually conferred on a prisoner of war but still in a position where disobedience of any consequence or an attempt to escape would certainly result in death.

The privileges given to the Soviet prisoner-guards apparently were to mollify them enough to prevent disciplinary problems and also to prevent their revolting against their captors. The use of liberty for four hours to visit a nearby town seems calculated to keep the prisoner-guards contented while preventing their getting a safe head-start if they decided to escape. Defendant testified that four of them did try and were surrounded by the Germans in a house and apparently executed. Approximately 15 prisoner-guards attempted to escape from Treblinka and defendant was unaware of what happened to them other than the four. One prisoner-guard was executed for disobedience and all the prisoner-guards were compelled to watch.

At the time of the uprising on August 2, 1943 defendant and the other prisoner-guards near him fired under orders from the Commandant[22]. However, defendant did not fire at any of the prisoners and the court doubts that he did anything other than shoot over their heads.

With the benefit of hindsight seated in a comfortable chair in an air-conditioned office it would be relatively easy to conclude that defendant should have turned his rifle on the SS on the day of the uprising or that he should have attempted to escape once he got to the nearby village. Defendant testified he discussed escape once with a fellow prisoner-guard but nothing further came of it.

However, the Code of Conduct for Members of the Armed Forces of the United States Imposing a Duty to Escape (Section III) was not promulgated until Executive Order No. 10631 dated August 17, 1955, after the Korean conflict. Previously with American military forces there had been

only an unwritten tradition to escape although apparently a written duty was once published in 1863. No evidence was presented that defendant was under a Soviet duty to escape or that he had been so instructed in the few, presumably disorganized, days between Russian mobilization and his capture.

If Fedorenko had refused to carry out orders at Treblinka, there is little doubt from the evidence that his execution would have been swift and sure. It no doubt would have occurred before a formation of other prisoner-guards to serve as an example to them. For a prisoner-guard at Treblinka to have denounced publicly the SS and what they were doing there would indeed have been a dramatic act of decency. It also would have been a dramatic act of self-destruction. As a court of equity, this court cannot impose such a duty upon defendant.

## CONCLUSIONS OF LAW

Based on the findings set forth the court now considers each count of the complaint.

There is no dispute that defendant lied when he gave his birthplace as Sarny, Poland and stated he worked in a factory in Poelitz, Germany. This misrepresentation would have been cause to deny defendant's application for citizenship. *Berenyi v. District Director, Immigration and Naturalization Service,* 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967), *In Re Petition of Haniatakis,* 376 F.2d 728 (3rd Cir. 1967). However, in a denaturalization proceeding a different standard obtains. Despite the fact that the immigration laws prohibit giving of false answers[23] and that therefore any misrepresentation is "illegal", once citizenship has been confirmed it may be taken away only if it can be clearly and convincingly shown that the misrepresentation was

**22.** When asked on cross-examination why he didn't shoot the commandant, he replied: "If you shoot the commandant, it is like shooting yourself."

**23.** The Act of May 22, 1918, as amended 40 Stat. 559, § 1(c) as in effect in 1949 prohibited the giving of any false statement in an application for permission to enter the United States. A similar provision in the current law may be found in Title 8 U.S.C. § 1325.

"material" *Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960). Although *Chaunt* considered only the question of obtaining citizenship through "willful misrepresentation of a material fact", the court finds that the standard must be the same where the charge is "illegal procurement" by virtue of a false statement. See *In Re: Field's Petition,* 159 F.Supp. 144 (S.D.N.Y.1958).

In *Chaunt* the Supreme Court held that proof of materiality requires clear and convincing proof that either (1) facts were suppressed "which, if known, would have warranted denial of citizenship" or (2) that their disclosure "might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship" 364 U.S. at 355, 81 S.Ct. at 151.

█ In the instant case the true facts regarding defendant's birthplace and nationality would not of themselves have justified denial of citizenship, for Ukrainians per se were not excluded under the Displaced Persons Act.[24]

█ Neither can the court conclude that the disclosure of these facts might have been useful in an investigation leading to the discovery of other facts possibly warranting denial of a citizenship. In fact, the truth regarding defendant's nationality and birthplace were revealed to the Government when defendant filed his Declaration of Intention in 1950 and again in 1951. Mr. Zimon, who interviewed defendant pursuant to his application for citizenship, testified that the disclosure of the previous false statement was not a cause for concern or further inquiry because it was a well known fact that many Ukrainians entering the country at that time had concealed their true nationality in order to avoid repatriation to the U.S.S.R. Further, Mr. Jenkins admitted defendant's being a Ukrainian was obvious from his name and religion.[25]

However, the question of defendant's whereabouts from 1942–1945 presents another matter. Defendant has admitted that he did not work in a factory in Poelitz, but instead worked as a prisoner-guard for ten months in Treblinka. However, he did serve as a prisoner-guard at Poelitz. If the Treblinka term had been known, it certainly would have prompted an investigation by the Vice-Consul to determine whether defendant committed atrocities at Treblinka or served voluntarily as a guard, or was otherwise excludable from admission under Section 2(a) or 2(b) of the Displaced Persons Act. However, the knowledge of defendant's being at Poelitz whether as a forced laborer or a prisoner-guard would have triggered the search of the records as well.

The Government has argued that under *Chaunt* it is not necessary to prove that the facts which would have been revealed through the investigation would have required denial of citizenship; the Government contends it is sufficient that the conceded facts prevented the Government from making an investigation which *might* have resulted in a denial of citizenship.

The language in *Chaunt* is ambiguous. The word "possibly" in the phrase "possibly leading to the discovery of other facts warranting denial of citizenship" could be read to modify the entire phrase, thus supporting the Government's interpretation that existence of facts warranting denial of citizenship need only be a possibility. However, if this were the intent of the Court, it

24. Displaced persons under the Act included any person who as a result of the actions of the authorities of Nazi or Fascist regimes, has been deported from or has been obliged to leave his country of nationality or of habitual residence. This definition would include Ukrainians who were forced from their homeland during the German invasion of the U.S.S.R.

25. Accord, and almost on all fours except it is an application rather than a denaturalization case: *In Re Iwanenko's Petition,* 145 F.Supp. 838 (N.D.Ill.1956). Iwanenko came to U. S. in 1950 after defendant's arrival and the case describes the fear of repatriation in detail. Jenkins claimed there was no repatriation as late as 1949 and no reason to fear it. However, the *Iwanenko* opinion described how rumors were still circulating among Russian nationals. Of course, defendant listed Sarny, Poland as his birthplace in 1945 when repatriation was unquestionably a peril and he was consistent in his 1949 application.

would have been clearer to state "facts which might warrant denial." On the other hand, it appears that the proper grammatical interpretation is that "possibly" modifies only the first part of the phrase, meaning that the existence of facts justifying denial is presupposed, and the only question is whether the suppressed facts would have provided a link to their discovery.

■ This second interpretation has been adopted in two circuits. In *United States v. Rossi*, 299 F.2d 650 (9th Cir. 1962), the court considered whether the fact that defendant had personated his brother, a Chilean citizen, thereby suppressing his true identity as an Italian, was material. The court found that although defendant thus succeeded in avoiding the quota restriction placed on Italians, the Government had not shown that defendant would not have been admissible because the quota had been filled, and the Government therefore had not met the burden of showing that the misrepresentation was material.

The Ninth Circuit more recently adhered to this same interpretation of *Chaunt* in holding in a deportation case that a suppressed fact is not material unless the truth would have justified denial of a visa. *La-Madrid-Peraza v. Immigration and Naturalization Service*, 492 F.2d 1297 (9th Cir. 1974).

Similariy, in *United States v. Riela*, 337 F.2d 986 (3rd Cir. 1964) the court cited *Chaunt* as holding that false statements are material if they resulted in the suppression of facts which if known would have warranted denial of citizenship.

Based on its reading of *Chaunt*, this court agrees with the interpretation followed in the Third and Ninth Circuits. The case of *Langhammer v. Hamilton*, 295 F.2d 642 (1st Cir. 1961) cited by plaintiffs, is not a denaturalization case and therefore is inapposite. Accordingly the court must determine whether the Government has presented clear and convincing proof that the true facts would have warranted denial of citizenship.

## APPROVAL OF DEFENDANT'S VISA APPLICATION

Witness Jenkins testified that a Vice-Consul's determination to approve or disapprove an application could only be overruled by the Consul General, and that overruling didn't happen. If anything in an application indicated prior service in a labor battalion or German unit an investigation would have been made to see if applicant served voluntarily.

Although defendant did not mention Treblinka in his history given to the Displaced Persons Commission he did mention his service at Poelitz near Stettin although he described it as a factory worker rather than a prisoner-guard. The case analyst signed off on the Displaced Persons Commission report on August 30, 1949. It was more than six weeks later on October 12, 1949 when the Vice-Consul at Hamburg approved defendant's application for a visa.

■ What happened in the intervening time? Was no inquiry made into the German records about Fedorenko being in whatever units were at Poelitz? Unlikely— Jenkins testified such information would have triggered an inquiry. Did the inquiry show his status there? If so, did the Vice-Consul apply the test that Jenkins had described, resolving the doubts to the benefit of the applicants? After all, doubts were resolved in favor of members of General Vlasov's army and their applications were approved. We can't be sure because the Government did not produce the Vice-Consul to testify. Not only were the doubts often resolved in favor of applicants under the Displaced Persons Act, but the Supreme Court instructs the United States Courts to resolve the law "as far as is reasonably possible" in favor of the naturalized citizen. *Schneiderman*, 320 U.S. at 122, 63 S.Ct. at 1335. Therefore this court must resolve the doubt in favor of defendant as to Counts 1, 2 and 3. This court specifically holds that petitioner lawfully entered the United States.

Count 4 of the complaint charges defendant with giving a false answer to question # 6 on the application form for citizenship

(form N–400). That question asks "Have you ever committed any crime, whether or not you were arrested? Inasmuch as the court has determined that the Government has failed to prove defendant's commission of any crimes, it cannot be said that defendant's answer was not truthful. Therefore the Government has failed to meet its burden as to Count 4.

Turning now to Count 5, question # 7 asked defendant to list membership in any organizations, including foreign military service. Defendant listed only Russian military service in 1941. Mr. Zimon, the naturalization examiner who used red markings to indicate his additions, added "labor union at work" as an organization of which defendant was a member.

The Government contends that defendant willfully failed to reveal his status as an armed guard for the Germans[26] in response to the question.

It is clear that defendant served only in the Russian Army until his capture in 1941. Defendant has maintained that he was a prisoner of war until his surrender to the British. It is clear that he was transported from place to place and was obliged to obey orders under penalty of death and was not free to do whatever he chose. In view of the evidence the court concludes that there would be strong reason in defendant's mind to view himself as a prisoner of war; it therefore cannot be said that his omission was willful. *United States v. Tooma*, 187 F.Supp. 928 (E.D.Mich.1960), *United States v. Profaci*, 274 F.2d 289 (2d Cir. 1960). Even if defendant clearly understood the question and willfully concealed the truth, the court must necessarily hold in accordance with the previous findings that the false answer was not proved to be material.

Counts 6 and 7 charge defendant with not being a person of good moral character

for the five years preceding naturalization both because of the commission of atrocities and because he lied on his N–400 form.

Good moral character is a difficult term to define. As the Supreme Court has stated, "the term, by itself is unusually ambiguous. It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitude, experience and prejudices of the definer". *Konigsberg v. State Bar of California,* 353 U.S. 252, 263, 77 S.Ct. 722, 728, 1 L.Ed.2d 810 (1957). Thus it has been consistently held that to meet the requirements for citizenship a petitioner's character must measure up to that of the average citizen in the community in which he resides. *Brukiewicz v. Savoretti,* 211 F.2d 541 (5th Cir. 1954). Although the immigration laws require proof of good moral character only for the five years preceding naturalization[27] conduct outside the statutory period is relevant and should be considered.[28]

The evidence concerning Fedorenko's good conduct for 29 years in America is uncontroverted. In contrast, the evidence concerning defendant's conduct at Treblinka is fraught with conflict and uncertainty and is therefore inconclusive.

While it may be true that defendant was not completely candid in his interviews with Immigration officials, and that such "temporizing with the truth" should not be condoned, the court cannot find under the circumstances that defendant was guilty of the type of willful deceit which alone might justify a revocation of citizenship. It must be again emphasized that the burden is no longer on defendant to demonstrate his entitlement to citizenship, but is on the Government to show clearly and convincingly that he is not. Compare *Berenyi,* supra, with *Chaunt,* supra. The court therefore concludes that the Government has not met its burden as to Counts 6 and 7 of the complaint.

---

**26.** The complaint originally charged defendant with being a member of the German Army. It was amended at the pretrial conference.

**27.** § 316(a) of the Immigration and Naturalization Act of 1952, 8 U.S.C. § 1427(a).

**28.** § 316(e), 8 U.S.C. § 1427(e) provides that the court may take into consideration as a basis for its determination the petitioner's conduct and acts at any time prior to that period.

## THE EQUITIES INVOLVED—AN ALTERNATIVE BASIS FOR THE HOLDING

 Even if the court were to find that defendant had willfully concealed material facts in applying for citizenship, the court's inquiry would not stop there. This denaturalization proceeding is a suit in equity, *Knauer v. United States, supra,* and equity demands the weighing of the rights of the parties in light of all the circumstances in order to arrive at a decision which is fair and just.

 The authority of the Government to take away citizenship fraudulently or illegally procured has repeatedly withstood constitutional challenge. See *Johannessen v. United States,* 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066 (1912); *Schneiderman v. United States,* supra; *Luria v. United States,* 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101 (1913). Moreover, this right is ordinarily not subject to defenses of laches, *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961), estoppel, *United States v. Ness,* 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321 (1917) or res judicata, *Johannessen v. United States,* 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066 (1912). Of course, this does not mean that the Government's power to bring suit is not subject to any limitations. The grant of citizenship confers on the individual all the rights and privileges guaranteed by the Constitution, and the Government may not revoke that grant on the grounds that are arbitrary, punitive or discriminatory. See *Schneider v. Rusk,* 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); *Rogers v. Bellei,* 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971).

The Supreme Court has held on several occasions that a certificate of citizenship shall be cancelled unless there has been strict compliance with the conditions imposed by Congress as prerequisites to the acquisition of citizenship. See *Maney v. United States,* 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156 (1928); *United States v. Ness,* 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321 (1917); *United States v. Ginsberg,* 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853 (1917).

However, court decisions in the area of denaturalization must be considered in light of the economic and social concerns of the times, as well as the unique facts of each case.

Early in this century Congressional concerns in the area of immigration law focused on the economic and social problems created by an influx of immigrants.[29] The Immigration and Naturalization Act of 1906 instituted major procedural reforms in the administration of the laws in an effort to curb the widespread abuses occurring at that time.[30] Thus many of the early denaturalization cases reflect the judicial concern for strict compliance with procedural requirements.[31]

During the war and post-war era of the 40's and 50's the cases take on a different posture, as the Supreme Court was faced with denaturalization suits in which the charge of illegality almost invariably was the claim that defendant was not "attached to the principles of the Constitution."[32]

In this era the court was clearly concerned that citizenship not be revoked solely on the basis of one's political or ideological beliefs. Consequently the court began

---

**29.** For a detailed outline of the history of the immigration laws see the Legislative History of the Immigration and Naturalization Act of 1952; reported at [1952] *U.S.Code Cong. & Admin.News,* pp. 1653–1674; pp. 1674–1682.

**30.** *See* Gordon & Rosenfeld, *Immigration Law & Procedure* § 20.1, 20–10 thru 20–11 (1975).

**31.** *See, e. g., U. S. v. Ginsberg,* 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853 (1917); *U. S. v. Ness,* 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321 (1917);

*Johannessen v. U. S.,* 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066 (1912).

**32.** *See, e. g., Schneiderman v. U. S.,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), *Baumgartner v. U. S.,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944), *Knauer v. U. S.,* 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946), *Maisenberg v. U. S.,* 356 U.S. 670, 78 S.Ct. 960, 2 L.Ed.2d 1056 (1958), *Nowak v. U. S.,* 356 U.S. 660, 78 S.Ct. 955, 2 L.Ed.2d 1048 (1958).

to exercise a virtually de novo right of review of lower court findings.[33]

Perhaps the most striking illustration of the scope of Supreme Court review is found in *Nowak v. United States,* 356 U.S. 660, 78 S.Ct. 955, 2 L.Ed.2d 1048 (1957) where the court virtually dismissed the testimony of the witnesses and the findings of two lower courts. This case presents a startling contrast to the standards used in considering petitions for naturalization where the burden is on the petitioner. *See, e. g., Berenyi,* supra.

Similarly, the Court took a very hard look at the evidence in *Chaunt v. United States,* supra, in order to conclude that the Government had not proven the significance of three minor arrests for membership in the Communist party, all omitted from defendant's application for citizenship.

In the late 50's and early 60's courts were faced with another category of cases as the Government began a program of seeking deportation of known or suspected underworld undesirables.[34]

Thus in *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) the Court found no reason to apply the equitable principles of laches in favor of defendant.

A review of the Supreme Court decisions in denaturalization cases over the last few decades reveals no case in which the Court has been faced with the question of whether a district court has discretion to consider the equities in determining whether citizenship should be revoked after many years.

However, lower courts have exercised discretion in determining whether citizenship should be granted. For example in *Petition of R.,* 56 F.Supp. 969 (D.Mass.1944) the court considered whether citizenship should be denied petitioner on the grounds that she had committed the crime of adultery. Judge Wyzanski observed that with respect to the requirement of showing good moral character: "Congress seems to have invited the judges to concern themselves not only with the technicalities of the criminal law, but also with the norms of society and the way average men of good will act . . ." *Id.* at 971. The court went on to hold that under the circumstances the certificate of citizenship should be granted.

Similarly, in *In Re Bespatow,* 100 F.Supp. 44 (W.D.Pa.1951) the court considered whether a conviction of manslaughter barred petitioner from citizenship. After examining the circumstances of the killing and considering petitioner's good behavior for 37 years, the court held that citizenship should be granted. Some courts have subsequently interpreted Section 101(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101(f) as a limitation on the court's discretion in determining good moral character.[35]

It is clear that in defining the statutory criteria, the courts continue to exercise discretion in order "to ameliorate hardship and injustice which otherwise would result from a strict and technical application of the law." *Wadman v. Immigration and Naturalization Service,* 329 F.2d 812, 817 (9th Cir. 1964). *See e. g. In re Briedis,* 238 F.Supp. 149 (N.D.Ill.1965); *In Re Edgar,* 253 F.Supp. 951 (E.D.Mich.1966); *Flumerfelt v. United States,* 230 F.2d 870 (9th Cir. 1956).

Additionally, in *In re Iwanenko's Petition,* 145 F.Supp. 838 (N.D.Ill.1958), a case similar in many respects to the instant one and containing extensive facts outlining the fear of many Ukrainians about repatriation

**33.** See *Baumgartner v. U. S.,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944).

**34.** See *Shaughnessy v. U. S. ex rel. Accardi,* 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955). Among the cases which appear to be part of the Government's effort are *U. S. v. Montalbano,* 236 F.2d 757 (3rd Cir. 1956) affirmed sub nom. *Genovese v. U. S.,* 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 244 (1956); *U. S. v.*

*Anastasio,* 226 F.2d 912 (3rd Cir. 1955); *Corrado v. U. S.,* 227 F.2d 780 (6th Cir. 1955); *U. S. v. Oddo,* 314 F.2d 115 (2d Cir. 1963).

**35.** *Gutierrez-Sosa v. Del Guercio,* 247 F.2d 266 (9th Cir. 1957); *Petition for Naturalization of O___ N___,* 233 F.Supp. 504 (S.D.N.Y.1964); *In re C___ C___ J___ P___,* 299 F.Supp. 767 (N.D.Ill.1969).

to the Soviet Union, the court did not stop with a technical analysis of whether petitioner's entry had been lawful under the Displaced Persons Act. Instead, the court went beyond technicalities to consider the humanitarian purposes of the law and concluded petitioner should not be excluded from citizenship.

Perhaps the best example of a court's applying an equitable and non-technical interpretation of the law is *United States v. Rossi,* 299 F.2d 650 (9th Cir. 1962). In that case the defendant had assumed the identity of his brother, a Chilean, so that he could circumvent the quota restrictions placed on Italian immigrants. As in this case, the government there argued that "the facts misrepresented were material to lawful entry and that Rossi was guilty of fraudulently misrepresenting them." *Id.* at 652. The court conceded that, "[m]anifestly, [Rossi's] intention was fraudulent." *Id.* However, the court looked for more than a technical violation of the law. It considered the heavy burden of proof placed upon the government by the Supreme Court in *Schneiderman* and *Chaunt,* and held that there had been an insufficient showing that permission to enter the country would have been withheld had the true facts been known.

█ If discretion may be exercised in a petitioner's favor in naturalization cases where the burden rests on petitioner, then surely the court can consider equitable and mitigating circumstances in a denaturalization case where doubts are to be resolved reasonably in favor of the citizen.

From the evidence and observing defendant for nearly three weeks in trial, the court concludes defendant is an unsophisticated man with very little education who is not only willing but anxious to work. He also is a man who is not interested in "making waves" or causing trouble.[36] Unquestionably the Germans spotted these qualities in him and selected him for training as a guard.

If the court were convinced that the allegations charging defendant with atrocities at Treblinka were true, there is no doubt that defendant would not be entitled to citizenship in a country which prides itself on its adherence to principles of equality and human dignity, and whose citizenry largely comprises descendants of immigrants who sought refuge from political oppression. However, this court must decide this case on the record before it and the strict burden of proof has not been met.[37]

█ The court recognizes that "[a]n alien has no moral nor constitutional right to retain the privileges of citizenship if, by false evidence or the like, an imposition has been practised upon the court, without which the certificate of citizenship could not and would not have been issued" *Johannessen v. United States,* 225 U.S. 227, 241, 32 S.Ct. 613, 617, 56 L.Ed. 1066 (1911). Nevertheless, where defendant has been a responsible citizen and resident for twenty-nine years, and the record as to his conduct thirty-five years ago is inconclusive, the

---

36. The court agrees with the assertion of defendant's counsel that Mr. Fedorenko wants to please and on cross-examination would finally give the answers he thought would please the questioner if the questions were slightly changed and the subject matter approached from a different angle. Consequently, the court tended to discount the later answer[s] given on a series of questions on the same subject on cross-examination. Despite the waiver of rights and the presence of an interpreter the court discounted the statement given the Immigration and Naturalization Service two years ago. With defendant's difficulty in communicating and his tendency to volunteer information that is harmful to his interest there was a pressing need for assistance of counsel.

37. Because the court has not found defendant committed the atrocities the Government claims he committed at Treblinka, it is not necessary for the court to confront the issue of whether sufficient duress was shown (or could be shown, in the eyes of the law) by defendant to excuse such conduct. If the court had found that the Government met its burden of proof in establishing that defendant committed the alleged atrocities at Treblinka, then it would have been necessary for the court to have granted a continuance in order for defendant to present testimony of the Russian witnesses he claimed could exonerate him.

court finds that the equities should be weighed in favor of defendant. Neither is the equitable balance tipped against defendant by his answers in 1945 and 1949. He was a victim of Nazi aggression, fearful of repatriation, many years and many miles from a home he thought to be empty of his wife and children, and was longing for a chance in America.

Because the Government has failed to meet its burden of proof judgment is entered for defendant. Under the circumstances of this case equitable considerations would also require the same result.